938 So.2d 181 (2006)
STATE of Louisiana
v.
Jeanie M. HANO.
No. 2005 KA 2090.
Court of Appeal of Louisiana, First Circuit.
June 9, 2006.
*184 Walter P. Reed, District Attorney, Covington, Dorothy Pendergast, Metairie, Counsel for Plaintiff/Appellee State of Louisiana.
Laurie A. White, Bradley E. Black, New Orleans, Counsel for Defendant/Appellant Jeanie M. Hano.
Before: KUHN, GUIDRY, and PETTIGREW, JJ.
KUHN, J.
Defendant, Jeanie M. Hano, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1.[1] She entered a plea of not guilty and, after a trial by jury, was found guilty as charged. The trial court denied defendant's motions for post verdict judgment of acquittal and a new trial and sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant's motion to reconsider sentence was also denied. Defendant appeals. We affirm the conviction and sentence.

STATEMENT OF FACTS
On July 9, 2003, Crystal Guidera discovered her sixteen-year-old boyfriend, T.J.J., unconscious.[2] Crystal contacted defendant with whom she had lived periodically and to whom she referred to as "Aunt Jeanie" although the two were not actually related. Defendant in turn contacted her fiancé, Chad Falgout,[3] to assist T.J.J. regain consciousness. After several unsuccessful attempts of reviving T.J.J., defendant drove him to St. Tammany Parish Hospital in *185 Covington, Louisiana. T.J.J. never regained consciousness during his hospitalization and needed to use a ventilator until he died on August 2, 2003. According to his death certificate, T.J.J. died of a polysubstance drug overdose of methadone and benzodiazepines.

OTHER CRIMES EVIDENCE
Among her complaints in the appellate challenge of her conviction and sentence, defendant asserts the trial court failed to conduct a hearing on the State's second notice of intent to introduce other crimes evidence. She avers that the trial court erred in admitting that evidence.[4]
At the commencement of trial, out of the presence of the jury, the State advised the court of a conversation in which defendant had asked Crystal to relay to the victim's father and other authorities that somebody had slipped T.J.J. a "Mickey" or something like that. The statement was included in a supplemental motion filed by the State and for which the defense did not lodge an objection. During the trial, Crystal related the gist of the conversation to the jury; again the defense did not lodge an objection. And when Crystal repeated the content of the conversation to the jury a second time, the defense again did not object. In her testimony, defendant conceded the fact and content of the conversation.
An evidentiary issue is not preserved for appellate review, unless a contemporaneous objection to the evidence was entered. See La. C.E. art. 103 A(1); La.C.Cr.P. art. 841. Because defendant did not contemporaneously object to the statement, this alleged error was not preserved for appeal.

SUFFICIENCY OF THE EVIDENCE
Defendant asserts that the evidence was insufficient to support her conviction under La. R.S. 14:30.1 A(3). Specifically, she maintains that the failure of the police to interview her son, Ian Hano, or his friend, Justin Whitfield,[5] amounted to an incomplete investigation and that the State's reliance on the victim's girlfriend, Crystal, who had a faulty memory, was on drugs at the time of her statement to the police, and gave inconsistent trial testimony that was not credible, was insufficient to establish beyond a reasonable doubt that defendant distributed or dispensed methadone to the victim or that the victim ingested or consumed the controlled dangerous substance. She also asserts that the evidence demonstrated that the methadone was, at most, a contributing factor to the victim's death but is insufficient to prove beyond a reasonable doubt that it was a direct cause of the victim's death.
In reviewing the sufficiency of the evidence to support a conviction, a Louisiana appellate court is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard of appellate review, which was adopted by the Legislature in enacting La.C.Cr.P. art. 821, is whether the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Brown, XXXX-XXXX, p. 22 *186 (La.4/12/05), 907 So.2d 1, 18. The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence not its sufficiency. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984). Accordingly, our role is not to assess credibility or reweigh evidence. State v. Smith, 94-3116, p. 2 (La.10/16/95), 661 So.2d 442, 443. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Higgins, XXXX-XXXX, p. 6 (La.4/1/05), 898 So.2d 1219, 1226, cert. denied, ___ U.S. ___, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
Louisiana Revised Statute 14:30.1 A(3) defines second degree murder as the killing of a human being when, among other things, the offender unlawfully distributes or dispenses a controlled dangerous substance classified in Schedule I or II, which is the direct cause of the death of the recipient who ingested or consumed the substance.[6] Methadone is classified as a Schedule II controlled dangerous substance. La. R.S. 40:964, Schedule II(B)(11). To support the conviction under La. R.S. 14:30.1 A(3), the record must contain evidence that: (1) defendant distributed or dispensed methadone to the victim, (2) the victim ingested or consumed the controlled dangerous substance, and (3) the victim died as a direct cause of ingesting or consuming the controlled dangerous substance.
For purposes of the Uniform Controlled Dangerous Substances Law, La. R.S. 40:961 to 40:995, "distribute" is "to deliver a controlled dangerous substance whether by physical delivery, administering, subterfuge, furnishing a prescription, or by filling, packaging, labeling or compounding the substance pursuant to the lawful order of a practitioner." La. R.S. 40:961(14). "Dispense" is "to deliver a controlled dangerous substance to the ultimate user or human research subject by or pursuant to the lawful order of a practitioner, including the packaging, labeling, or compounding necessary to prepare the substance for such delivery." La. R.S. 40:961(13). "Deliver" and "delivery" are defined as "the transfer of a controlled dangerous substance whether or not there exists an agency relationship." La. R.S. 40:961(10). The case law has defined "deliver" as transferring possession or control. The transfer of possession or control, i.e., distribution, is not limited to an actual physical transfer between the culpable parties but may be accomplished by the imposition of a third party. State v. Parker, 536 So.2d 459, 463 (La.App. 1st Cir. 1988), writ denied, 584 So.2d 670 (La. 1991).
A defendant may be guilty as a principal in the crime of distribution if she aids and abets in the distribution or directly or indirectly counsels or procures another to distribute a controlled dangerous substance. See La. R.S. 14:24. Although "[i]t is not necessary to `sell' contraband to *187 aid and abet its distribution" a "distributor" must do more than merely receive the controlled substance as a user. State v. Celestine, 95-1393, pp. 3-5 (La.1/26/96), 671 So.2d 896, 897-898 (per curiam)(and cases cited).
An appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Azema, 633 So.2d 723, 727 (La.App. 1st Cir.1993), writ denied, 94-0141 (La.4/29/94), 637 So.2d 460; State v. Quinn, 479 So.2d 592, 596 (La.App. 1st Cir.1985).
We turn first to defendant's contention that the evidence is insufficient to establish that she distributed the controlled dangerous substance to T.J.J. and that he ingested it. We find the following testimony descriptive of events and pertinent to our discussion.
Timothy L. Johnson, the father of the victim, testified that he became aware of the T.J.J.'s drug use when he was arrested and enrolled in drug court. Although T.J.J. tested positive for the drug Ecstasy while in drug court and spent a couple weeks in a juvenile detention facility, he graduated from drug court without further incident in May of 2003. Crystal began residing with the Johnsons when she was thirteen years old. Apparently Crystal's mother moved a lot and, to keep Crystal in school regularly, Johnson invited Crystal to live with them. Three days before T.J.J.'s death, when he was sixteen and Crystal was fourteen, Johnson permitted T.J.J. to move into an apartment with Crystal near Crystal's aunt.
On July 9, 2003, at approximately 4:15 p.m., defendant called Johnson and told him that T.J.J. had taken an overdose. Defendant said that she was taking T.J.J. to St. Tammany Parish Hospital and that Johnson did not need to meet them there. At the hospital, Johnson talked to Crystal, who advised him that defendant had been the provider of the drugs that T.J.J. had taken.
Detective Fred Roshto, an employee of the St. Tammany Parish Sheriff's Office at the time of the incident who conducted the investigation of T.J.J.'s death, interviewed Crystal at the time of T.J.J.'s admission to St. Tammany Parish Hospital. Crystal told the detective that she and T.J.J. had purchased and ingested narcotics, and that T.J.J. appeared to have overdosed. Crystal said that leftover narcotics were located at their apartment in a wooden cigar box on the bedroom floor and gave Detective Roshto consent to search the apartment.
Detective Roshto could not locate the box. Crystal's aunt advised him that defendant had come to the apartment and retrieved the box, telling him where defendant lived. At her residence, Detective Roshto found defendant along with Falgout and Ian. Defendant told the detective that she had taken T.J.J. to the hospital and that Falgout had picked her up and brought her home from there; she had not gone anywhere after leaving the hospital. Detective Roshto advised defendant of her Miranda rights, explaining that he had reason to believe she had been to the victim's apartment. Stating that she was groggy, defendant then acknowledged she had returned to the residence to retrieve a DVD player. She also admitted that she had taken the cigar box, which contained marijuana, and that she had subsequently *188 disposed of the box and its contents by tossing them into a dumpster at a gas station.
At Detective Roshto's request, defendant and Falgout agreed to provide further statements at the sheriff's office. At the station, defendant stated that she had thrown the cigar box and its contents on the side of the road. But when Detective Roshto advised her that the empty cigar box had been retrieved from a dumpster near her residence, defendant admitted she had thrown it there, continuing to claim that she had disposed of the marijuana on the side of the road.
The detective testified that at 11:46 p.m. on July 9, 2003, defendant gave a tape-recorded statement. Defendant stated that Crystal had called her residence earlier that morning and spoken to Falgout, telling him that she could not awaken T.J.J. Although defendant explained that she was not alarmed because Crystal and T.J.J. normally slept late, she nevertheless stated that she advised Crystal to call 911. Around 4:00 p.m., after running some errands, defendant went by the apartment to check on Crystal and T.J.J. and to retrieve her DVD player. When defendant entered the unlocked apartment, Crystal was sleeping and T.J.J. was unconscious. Defendant opened T.J.J.'s eyelids and noted his pupils were dilated. She performed CPR on T.J.J. and placed him in a tub of water, hoping to revive him. Crystal did not want defendant to call 911 because she did not want to be evicted from the apartment. Defendant called Falgout to assist her. They attempted to induce vomiting and continued putting water on T.J.J. Defendant then decided to take T.J.J. to the hospital and contacted his father.
In the tape-recorded statement, defendant also stated that she went back to the apartment to retrieve the drugs because she did not want T.J.J. or anyone on the property to be penalized for possessing them. She speculated that the methadone T.J.J. had taken could have come from an acquaintance who had been in a motorcycle accident.
Defendant confirmed to Detective Roshto that she was taking methadone for chronic pain management based on a prescription from a Dr. Eliosoff. She indicated that her dosage was ten milligrams. She told Detective Roshto that she had noticed that six of her pills were missing and suggested that T.J.J. could have stolen them from her when he and Crystal had stayed with her for a couple of days.
Detective Roshto believed that defendant and Falgout were "doctor shopping," i.e., seeing multiple doctors at the same time in order to get prescription pain medication.[7] His investigation also established *189 that defendant was not receiving methadone from more than one doctor at a time and that according to defendant's doctors, she suffers from chronic pain.
Crystal testified that she was with T.J.J. at the time of his overdose. On July 8, 2003, near noon, Crystal observed T.J.J. acquire two methadone pills while they were at defendant's residence. Defendant asked T.J.J. whether he wanted to purchase methadone pills for five dollars a pill. Crystal specifically observed defendant place two methadone pills in T.J.J.'s hand. She did not see him give defendant the ten dollars in exchange, but T.J.J. told Crystal that he had. Crystal and T.J.J. went back their apartment, where she took one pill and he took the other.
Later that day, they returned to defendant's home, where Crystal, T.J.J., and defendant's son, Ian, smoked marijuana. Around 3:30 p.m., Crystal and T.J.J. purchased four more methadone pills. According to her trial testimony, Crystal was not sure whether she entered the trailer when the second transaction took place, but she was certain that T.J.J. and Ian had. During an audiotaped interview with Detective Roshto on July 10, 2003, Crystal had stated that she waited in the vehicle while the second drug transaction took place. She also told Detective Roshto that she and T.J.J. had paid twenty dollars to Falgout, who had given the money to defendant, and then defendant gave them the pills. But at trial, Crystal acknowledged that she did not actually see any part of the second transaction, indicating that portion of her audiotaped statement had been based on information that had been told to her by T.J.J.
According to Crystal's trial testimony, after T.J.J. purchased the pills, they went back to the apartment. She was not sure whether Justin was with them at the time, but she was certain that Ian was. Crystal and T.J.J. consumed two of the four pills, taking a portion by mouth and inhaling the rest. The next thing Crystal recalled was waking up briefly the following morning and going back to sleep without noticing anything unusual. But that afternoon when she woke up, T.J.J.'s lips were purple. She tried to wake him up but could not. T.J.J. was making sounds from his lungs. She tried to give him mouth-to-mouth resuscitation and turned him over; T.J.J. vomited. Because she had seen defendant help Falgout before when he was in a condition similar to T.J.J.'s, Crystal called defendant. She did not call 911 because she was afraid.
After she and defendant had taken T.J.J. to the hospital, while standing near the emergency room entrance, defendant told Crystal that she should "tell [T.J.J.'s father] that [she] didn't know what happened, that somebody must have slipped him something in his drink." Crystal did not.
Justin testified for the defense, indicating that he had known T.J.J. for about two years. He described that the victim liked to "get loaded" and often consumed alcohol and pills like xanbars, somas, lortabs, and methadone. He had witnessed T.J.J. inhale a small white methadone pill the night before he was hospitalized but did not know from where it had come. Justin recalled having been with T.J.J., Crystal, and Ian all day on July 8th and accompanying them during the second trip to defendant's residence. When they arrived, T.J.J. indicated that he needed to talk to Falgout. Justin saw Falgout with a "handful of pills," but defendant was not present at that time, and he did not see any exchange of money for pills. He was with T.J.J., Crystal, and Ian when they drove back to the apartment. Crystal and T.J.J. argued about money. T.J.J. had money when they went to defendant's residence *190 but did not have any on the way home; T.J.J. had no pills on the way to defendant's residence but had some on the way back. Subsequently, he watched T.J.J. crush some of the pills and as T.J.J. and Crystal snorted them. Later that evening, T.J.J. and Crystal took Justin and Ian back to defendant's residence. The next day, Justin and Ian returned to the apartment with defendant and helped in the attempts to revive T.J.J.
Ian testified on his mother's behalf, indicating that Falgout had given and consumed drugs with him in past. He stated that defendant had never given him drugs and that his mother did not know that Falgout had given him drugs. But Ian admitted that he and defendant occasionally smoked marijuana together. He knew that on occasion Falgout had paid T.J.J. with drugs instead of money for work T.J.J. had done for him. At the time of the second drug transaction, Ian remained in the vehicle with Crystal. He saw his mother talk to Crystal and noticed that she had given Crystal "something." But because he was listening to the radio, Ian could not hear the conversation between Crystal and his mother. He thought that his mother had taken the pills away from T.J.J. and given them to Crystal because she did not want the victim to take them. Later that night, he watched as T.J.J. and Crystal consumed the drugs. He also was present at the apartment the next day during the efforts to revive T.J.J.
During her trial testimony, defendant indicated that on the evening of July 8, 2003, Falgout had sold T.J.J. four ten-milligram methadone pills that belonged to her. She did not know about or agree with the transaction. Falgout had been abusive during their relationship and because she was afraid of him, she allowed the transaction to take place. Falgout consumed and sold a lot of his medication, and, therefore, she shared her medication with him.
After Falgout gave the pills to T.J.J., defendant told T.J.J. to give them to her, indicating she wanted to talk to Crystal whom she thought would not approve of the transaction. She then gave the pills to Crystal, believing that Crystal would not allow T.J.J. to consume them.
Defendant admitted that she had lied during her statement to the police when she told them that she had discarded the contents of the cigar box, explaining she had been afraid and did not have an attorney present. In court, she said that she had actually placed the remaining pills back into her pill bottle.
Defendant denied having sold two methadone pills to T.J.J. prior to Falgout's sale of four pills. She admitted that she allowed her son and other minors to "do drugs" in her home reasoning that it was a safe place and suggesting that the other parents were aware of the drug use. Falgout financially supported the household with the money that he made from drug sales. When asked whether she had distributed four ten-milligram methadone pills, defendant admitted, "I distributedI gave [Crystal] what [Falgout] sold [to the victim]. Yes, sir."
When Crystal first called defendant the next day, she told her to call 911, stating that it had not occurred to her that T.J.J. had consumed the methadone pills. She then ran errands. Defendant admitted that she had asked Crystal to lie, stating, "I asked her to tell them that maybe someone had slipped something into his drink only because Crystal had partaked (sic) in this, and I had partaked in this, and [Falgout] had partaked in this." Defendant added that she loved T.J.J. and did not want him to get into trouble. She did not know or understand why Crystal had implicated *191 her since Falgout was the one who had actually sold the drugs.
Based on this testimony, the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact beyond a reasonable doubt that defendant distributed and dispensed methadone to T.J.J., and that he ingested it. The jury was required to consider the veracity of the testimony and give it the weight it deemed appropriate. And it was free to accept in whole or part the testimony of any witness. Apparently, the jury found Crystal a credible witness, which was within its province. Crystal testified that she witnessed defendant deliver to T.J.J. two pills. This testimony establishes that defendant distributed methadone to the victim. Crystal also testified that she and T.J.J. each took one of the two pills, thereby establishing that T.J.J. ingested the methadone. Because Crystal's testimony alone is sufficient to support the first two elements necessary to uphold a conviction under La. R.S. 14:30.1, whether Crystal was present and actually witnessed the second transaction is of no moment. Moreover, although her testimony is not in conformity with Crystal's on the particulars, defendant admitted knowledge of and involvement in the second methadone sale. The jury was free to reject defendant's claim that she had not sold any pills to T.J.J. and had merely given the four pills that Falgout had sold to him in the second sale to Crystal rather than to T.J.J. And while defendant complains that the criminal investigation was faulty in that it failed to include statements by Justin and Ian, the jury was privy to that testimony and apparently found it insufficient to establish defendant's innocence. Accordingly, the evidence supports beyond a reasonable doubt the jury's conclusions that defendant distributed methadone to T.J.J. and that he ingested the illicit drugs.
We turn now to defendant's challenge of the sufficiency of the evidence insofar as it establishes that the direct cause of T.J.J.'s death was the ingestion of the methadone she had distributed to him. The record discloses the following relevant evidence.
Dr. James Robinson, who treated T.J.J. during his hospitalization, was called as a witness for the defense. Dr. Robinson explained that a measurement for the level of benzodiazepine in the T.J.J.'s system at the time of his hospitalization was not requested because it would not have influenced T.J.J.'s treatment. According to Dr. Robinson T.J.J. died as a result of a hypoxic brain injury, which caused his brain to starve from lack of oxygen. The ingestion of methadone along with any other drugs that T.J.J. may have taken could have caused acute respiratory depression and resulted in the hypoxic brain injury. He explained that, in general, all narcotics have the ability to suppress the body's inherent drive to breathe. If the levels become low enough, the brain suffers a hypoxic injury. Eventually, the damage is irreparable. Dr. Robinson opined that the hypoxic injury could have also been caused when T.J.J. vomited. He explained that a person whose level of consciousness is sufficiently depressed will not protect his own airway and when vomiting could then inhale the vomitus into his larynx, airway, and lungs causing a hypoxic injury. Dr. Robinson agreed that methadone was a nausea-producing drug that sedates those who ingest it and causes the vomiting that could have resulted in the hypoxic brain injury. He also acknowledged that the hypoxic injury was traced to the ingestion of methadone whether it was a result of an acute respiratory depression or vomiting.
Defense witness Dr. William George, a toxicologist at Tulane Medical Hospital, *192 testified that based on the medical information available, he could not determine whether methadone alone was the direct cause of T.J.J.'s death. He explained that the benozodiazepine found in T.J.J.'s body was also unlikely to have been a direct cause of death. But the combination of the two drugs causes people to die and in this case the presence of the methadone cannot be separated from the presence of the benozodiazepine. He stated that methadone was clearly a component in causing T.J.J.'s death, emphasizing that it was the combination of the drugs that gave rise to his death. Dr. George agreed with Dr. Robinson that aspirated vomitus was a possible cause of death. He stated that the combination of ingesting methadone and benzodiazepines led to central nervous system and respiratory depression which, alone or in combination with aspiration, was the actual cause of death. Dr. George agreed that the ingestion of methadone causes vomiting and, like Dr. Robinson, acknowledged that the ingestion of methadone was a mechanism of T.J.J.'s death whether it was a result of an acute respiratory depression or vomiting.
Dr. Michael Defatta, the chief deputy coroner and forensic pathologist for St. Tammany Parish, testified that an autopsy was not performed on T.J.J. because his medical records were sufficient to determine the cause of death. Dr. Defatta explained that respiratory suppression/depression occurs when particular drugs block receptors in the brain that tell the body to breathe. Methadone is a very potent synthetic opiate that binds to the receptors in the central nervous system and blocks the action of those receptors. Benzodiazepines are in the sedative hypnotic class and are used to treat anxiety. They also serve as a central nervous system depressant, meaning they will block receptors in the brain and inhibit those receptors from acting properly. Dr. Defatta confirmed that in this case, the intake of the methadone and benzodiazepine was the direct cause of the T.J.J.'s death. Dr. Defatta believed that an earlier intervention may have saved his life.
Based on the medical testimony, we find the evidence was sufficient to convince a rational trier of fact that the methadone was the direct cause of T.J.J.'s death. All three medical experts agreed that whether T.J.J. died as a result of respiratory suppression from ingesting the combination of drugs or from vomiting, which may have been caused by either or both drugs, it was the presence of methadone and benzodiazepines that gave rise to the hypoxic brain injury that ultimately caused his death.
Defendant intimates that in order to be a direct cause of death, the presence of the methadone would have had to have been the only drug that gave to the hypoxic brain injury. We disagree.
Defendant has cited, and we have found, no jurisprudence to support a finding that the direct cause required to be proven under La. R.S. 14:30.1 A(3) must be the only cause of the death of the recipient who ingested or consumed the controlled dangerous substance. The evidence established that the ingestion of the methadone T.J.J. obtained from defendant set in motion the train of events which brought about T.J.J.'s death. But for the ingestion of the methadone that defendant distributed to T.J.J., he would not have died. That the methadone acted in concert with the benzodiazepine in his body does not eliminate its effect in directly causing T.J.J.'s death. See State v. Jones, 598 So.2d 511, 514 (La.App. 1st Cir.1992) (finding that it is not essential that the act of the defendant should have been the sole cause of the victim's death; if the act hastened the termination of life, or contributed to the *193 victim's death, in a degree sufficient to be a clearly contributing cause, the defendant's act constituted the "legal cause" of death). Thus, the medical testimony is evidence beyond a reasonable doubt that supports the jury's conclusion that T.J.J. died as a direct cause of ingesting the methadone defendant distributed to him.
Accordingly, we find the evidence was sufficient to convince a rationale trier of fact that all the elements of La. R.S. 14:31.1 A(3) were proven beyond a reasonable doubt. This assignment of error lacks merit.

EXCESSIVENESS OF SENTENCE
Defendant avers that imposition of life at hard labor imposed by the trial court is excessive. Maintaining that the evidence fails to establish the methadone was the direct cause of T.J.J.'s death, she asserts that, at most, her minimal role amounts to negligence. She points out that co-defendant, Chad Falgout, was more culpable and, after pleading guilty to manslaughter, received only a fifteen-year sentence. She also claims that the trial court failed to consider her attempts to mitigate Falgout's actions by taking the methadone from T.J.J. and giving it to Crystal.
Article I, Section 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. Although a sentence may fall within statutory limits, it may nevertheless violate a defendant's constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Generally, a sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one's sense of justice. State v. Reed, 409 So.2d 266, 267 (La.1982). A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Lanclos, 419 So.2d 475, 478 (La.1982). State v. Felder, 2000-2887, p. 11 (La.App. 1st Cir.9/28/01), 809 So.2d 360, 370, writ denied, XXXX-XXXX (La.10/25/02), 827 So.2d 1173; see also State v. Savario, 97-2614, p. 8 (La.App. 1st Cir.11/6/98), 721 So.2d 1084, 1089, writ denied, 98-3032 (La.4/1/99), 741 So.2d 1280.
Under La. R.S. 14:30.1 B, a person convicted of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Courts are charged with applying a statutorily-mandated punishment unless it is unconstitutional. State v. Dorthey, 623 So.2d 1276, 1278 (La.1993). Indeed, it is incumbent on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional by "clearly and convincingly" showing that she is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Henderson, 99-1945, p. 19 (La. App. 1st Cir.6/23/00), 762 So.2d 747, 760, writ denied, 2000-2223 (La.6/15/01), 793 So.2d 1235.
The Code of Criminal Procedure sets forth, in Article 894.1, items that must be considered by the trial court before imposing sentence. Generally, the trial court need not recite the entire checklist of factors, but the record must reflect that it *194 adequately considered the guidelines. State v. Shipp, 98-2670, p. 6 (La.App. 1st Cir.9/24/99), 754 So.2d 1068, 1072. The failure to articulate reasons for the sentence as set forth in Article 894.1 when imposing a mandatory life sentence is not an error. Articulating reasons or factors would be an exercise in futility since the court has no discretion. Felder, 2000-2887 at p. 13, 809 So.2d at 371.
In this case, we find that defendant failed to rebut the presumption that her mandatory life sentence for her second degree murder conviction is constitutional. We find the record adequately justifies the trial court's refusal to deviate from the legislative mandate. The evidence indicates that defendant  alone or as a principal  intentionally distributed drugs to the minor victim. Although she characterizes her role in the distribution of methadone to T.J.J. as "minimal," mindful of her active involvement in teenage illicit drug abuse within her home and given her almost familial connexity with Crystal, defendant's position of trust factored into the ease with which these minors obtained the methadone.
Nothing in the law requires a sentencing judge to treat co-defendants equally. All defendants are to be afforded the same sentencing consideration, but no particular results are compelled. State v. Sylvas, 558 So.2d 1192, 1202 (La.App. 1st Cir.1990). Results are measured only against the requirement that sentences not be excessive. State v. Day, 414 So.2d 349, 352 (La.1982). Sentencing disparity among co-defendants is only a factor to be considered along with other appropriate considerations, when there is no reasonable basis in the record for the disparity. State v. Quimby, 419 So.2d 951, 962 (La. 1982). Moreover, sentencing disparities are inherent in a system where punishment is tailored to fit the defendant and the crime. Day, 414 So.2d at 352. That Falgout, who pled guilty and avoided a trial before a jury, received a more favorable sentence for his involvement in T.J.J.'s death does not diminish defendant's role in T.J.J.'s death. As Ian's mother and Crystal's so-called aunt, the record supports a finding that defendant was the source of contact for the illicit drug transaction.
Although defendant claims that her action of giving the four methadone pills to Crystal instead of T.J.J. has a mitigating effect that the trial court overlooked in imposing sentence, Crystal denied the veracity of the statement. Moreover, any mitigating affect created by a finding that she had taken the four methadone pills from the victim was offset by her admission that she gave them to another minor.
Defendant has failed to establish that the circumstances of her case are so exceptional that she is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. This assignment of error lacks merit.

INEFFECTIVE ASSISTANCE OF COUNSEL
Defendant maintains that she received ineffective assistance of counsel, contending that trial counsel failed to effectively cross-examine the State's witnesses and to adequately prepare the defense experts for trial testimony. She notes that her counsel did not ask any questions on cross-examination at the March 31, 2005 hearing on the State's first supplemental notice of intent to introduce evidence of other crimes under La. C.E. art. 404 B. She also asserts that her counsel failed to provide defense witness Dr. George with relevant documentation and to check Dr. George's calculations for accuracy, *195 noting that Dr. George's estimation of the level of methadone ingestion was based on the incorrect assumption that T.J.J.'s blood was drawn one day, as opposed to two days, following his ingestion.
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) established a two-fold test to evaluate claims of ineffective assistance of counsel. First, the defendant must show that counsel committed errors so serious that he or she was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment. Second, the defendant must show that the errors were so serious as to deprive him of a fair trial, one with a reliable result. Strickland, 466 U.S. at 686-88, 104 S.Ct. at 2064. Defendant must make both showings in order to prove that counsel was so ineffective as to require reversal of the conviction.
A claim of ineffective assistance of counsel is more properly raised by an application for post-conviction relief where a full evidentiary hearing may be conducted. Only where the record discloses sufficient evidence to decide the issue of ineffective assistance of counsel when raised by assignment of error on appeal, may it be addressed in the interest of judicial economy. State v. Lockhart, 629 So.2d 1195, 1207 (La.App. 1st Cir.1993), writ denied, 94-0050 (La.4/7/94), 635 So.2d 1132. The investigation of strategy decisions requires an evidentiary hearing and, therefore, cannot possibly be reviewed on appeal. See State v. Martin, 607 So.2d 775, 788 (La. App. 1st Cir.1992).
At the hearing on the admission of evidence of other crimes, the State called one witness.[8] Defendant's counsel did not question the State witness or present argument on behalf of his client. Defendant's allegation of ineffectiveness, challenging her counsel's decision to not question the State witness during the hearing, constitutes an attack upon a strategy decision made by trial counsel for which evidence is not contained in this record. Likewise, the allegation that counsel failed to provide adequate documentation to defense witness Dr. George is one that would require an evidentiary hearing to resolve.[9] Accordingly, we find that defendant's claims of ineffectiveness are not subject to appellate review in this appeal.

REVIEW FOR ERROR
Defendant requests a review of the record for "patent" errors. Under La.C.Cr.P. art. 920(2), our review is limited to discovery of structural defects in the proceedings, which are apparent by a mere inspection of the pleadings and without an evaluation of the evidence. Trial errors that do not constitute structural defects are subject to the harmless error analysis. See State v. Thomas, 2005-2373, p. 1 (La.4/17/06), 926 So.2d 490, 491 (per curiam); see also State v. Jones, XXXX-XXXX, pp. 3-4 (La.2/22/06), 922 So.2d 508, 511-12. After a careful review of the record in these proceedings, we have found no reversible errors.

DECREE
For all these reasons, we affirm the conviction and sentence of defendant, Jeanie M. Hano.
*196 CONVICTION AND SENTENCE AFFIRMED.
GUIDRY, J., dissents and assigns reasons.
GUIDRY, J., dissenting.
I dissent from the majority opinion in this matter. Louisiana Revised Statute 14:30.1 A(3), in defining second-degree murder, requires that the controlled dangerous substance classified in schedule I or II be the direct cause of the death of the recipient who ingested or consumed the substance. The medical evidence in record before us simply shows that the methadone provided by the defendant was one of several drugs in the victim's system that contributed to his death. Thus, the State did not meet its burden of proving beyond a reasonable doubt that the methadone provided by the defendant was the direct cause of the victim's death. Therefore, I respectfully dissent.
NOTES
[1] Although defendant was originally indicted along with co-defendant, Chad Falgout, his case was severed by the State.
[2] In accordance with La. R.S. 46:1844 W, we refer to this minor victim only by his initials.
[3] Since the time Crystal was an infant, she had lived with defendant periodically and, although they were not related, had referred to defendant as "Aunt Jeanie."
[4] See generally La. C.E. art. 404 B and State v. Prieur, 277 So.2d 126 (La.1973) (requiring the State to furnish defendant with a statement in writing of the criminal acts or offenses it intends to offer in evidence, specifying the exception to the general exclusionary rule upon which it relies for admissibility).
[5] According to the record, Ian was nearly twelve years old at the time of the offense and fourteen at the time of trial. At trial Justin did not testify as to his age, although he indicated that he was in the ninth grade.
[6] The jury was instructed that second degree murder included the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm as set forth in La. R.S. 14:30.1 A(1). But the record is devoid of any evidence from which the jury could have inferred that defendant had the specific intent to kill or to inflict great bodily harm to the victim. Thus, the sole basis of the jury's verdict finding defendant guilty of second degree murder is under La. R.S. 14:30.1 A(3).
[7] Pharmaceutical records confirmed that defendant had two other physicians whom she had not mentioned during her recorded interview: Dr. Pfingsten and Dr. McNulty. Pharmaceutical records confirmed that Falgout had been filling prescriptions written by a Dr. Jarrott. Between August 2002 and April 2003, defendant filled prescriptions from Dr. McNulty for carisoprodol, alprazolam, hydrocodone, prednisone, and nortriptyline. From April 2003 to July 2003, defendant filled prescriptions for methadone (ten-milligram pills), carisoprodol, and clonazepam (three prescriptions from Dr. McNulty, ten prescriptions from Dr. Eliosoff, and three prescriptions from Dr. Pfingsten). The specific dates of the methadone prescriptions are April 30, 2003, May 30, 2003, and June 30, 2003. Each methadone prescription was for 120 (ten milligram) pills. In May of 2003, defendant was seeing Dr. Bey, who was filling prescriptions for clonazepam, carisoprodol, and hydrocodone. Also in May of 2003, Dr. Eliosoff noted in defendant's medical records, "chronic pain syndrome and possible drug abuse" by defendant. Falgout had filled prescriptions for soma, lortab, xanax, clonazepam, carisoprodol, hydrocodone, and methadone (40 milligram diskette wafers).
[8] Having occurred prior to severance of his trial with that of defendant, counsel for Falgout cross-examined the State witness and presented argument to the trial court.
[9] In order to receive an evidentiary hearing, defendant otherwise must satisfy the requirements of La.C.Cr.P. arts. 924-930.8, and, thus, we express no ruling on defendant's entitlement to such a hearing.