McClendon, j.
|2Pefendant, Jarret Jean McCasland, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. Defendant entered a plea of not guilty and, following a jury trial, was found guilty as charged. Defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant filed a motion to reconsider sentence; the trial court heard argument at a hearing and denied the motion. Defendant now appeals designating four assignments of error. We affirm the conviction and sentence.
FACTS
On the evening of July 25, 2013, Flavia Cardenas (also known as Cathy) and her boyfriend, defendant herein, went to the home of Flavia’s friend, Christina Garman, who lived on Cedarcrest Avenue in Baton Rouge. Flavia had just recently turned nineteen years old; defendant was twenty-four years old. The three went to Christina’s bedroom. Defendant and Flavia began using cocaine and heroin. According to Christina, who testified at trial, defendant, using a syringe and needle, injected heroin three time's into Flavia, and also injected cocaine into Flavia two or three times. Defendant injected himself with the drugs, and Christina injected herself once with cocaine. All the injections from defendant were in Flavia’s arm (or arms) except the last one. When defendant attempted to administer the third dose of heroin to Fla-via, the needle broke off in her arm. With the heroin still in the syringe and no extra needles, defendant administered the drug anally to Flavia. According to Christina, defendant and Flavia left her house about 10:30 p.m.
Around 11:00 p.m. or 11:30 p.m., defendant brought Flavia home to her mother’s house on W. Versailles Drive. Flavia’s mother, Nancy Landa, testified at trial that when Flavia and defendant came inside, they were arguing, and defendant was being very aggressive with Flavia. Defendant grabbed Flavia’s phone and left. Crying, Flavia used Nancy’s phone to call defendant. Defendant returned to the house, and he and Flavia went to Flavia’s bedroom. Now past midnight, Nancy went to Flavia’s room a few times to ask them to lower their voices. Later, Nancy was *1122 struck by a > period of “total silence” in Flavia’s bedroom after all of the arguing. When Nancy went to Flavia’s Lbedroom to see what was going on, she saw defendant spoon-feeding cereal to Flavia. Nancy briefly went back to her own bedroom, then returned to Flavia’s room, and told defendant that he had to leave. Defendant became angry and started yelling at Nancy. Defendant left briefly, but then returned and told Nancy that he had forgotten his keys. Defendant left again, then returned, and told Nancy he had to get súme of his things from Flavia’s room. Defendant left the house for the final time at about 2:00 a.m.
Nancy checked on Flavia, who told her mother that she was tired and . that they could talk tomorrow. Later that morning (now July 26) at about 9:30 a.m. or 10:00 a.m.,, Nancy went to Flavia’s room to wake her up. Flavia did not respond. Nancy called her neighbor, Joaquin Jule, for help. Joaquin arrived shortly thereafter, found Flavia non-responsive, and called 911. The 911 operator told Joaquin to try CPR on Flavia. Joaquin noticed that Flavia’s lips were turning purple. He started chest compressions on Flavia, to no avail. Flavia was brought to the hospital where doctors were unable to revive her. Flavia died from acute respiratory depression caused by a heroin overdose.
Defendant did not testify at trial. About two wéeks after Flavia’s death, defendant was brought to the police station for questioning. In his recorded (audio) statement, defendant said that he injected Flavia with cocaine only. According to defendant, when they were at Nancy’s house in Flavia’s bedroom, defendant had a syringe of heroin and was going to inject, Flavia with it; but Flavia was moving around so much that he could not inject her. Impatient, Flavia took the syringe, according to defendant, and injected herself.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant argues that his life sentence at hard labor, as applied to him, is unconstitutionally excessive.[1]
The Eighth Amendment to the United States Constitution and Article I, § 20, of the Louisiana Constitution prohibit the imposition of cruel or excessive punishment. | .Although -a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La. 1979). A sentencé is considered constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Andrews, 94-0842 (La.App. 1 Cir. 6/6/96), 665 So.2d 448, 464. The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Holts, 525 So.2d 1241, 1245 (La.App. 1 Cir. 1988). Louisiana Code of Criminal Procedure Article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While *1123 the entire checklist of LSA-C.Cr.P. art. 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. State v. Brown, 02-2231 (La.App. 1 Cir. 5/9/03), 849 So.2d 566, 569.
The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where thére has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475, 478 (La. 1982). The trial court should review the defendant’s personal history, his prior criminal record, the seriousness "of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation through correctional services other than confinement. See State v. Jones, 398 So.2d 1049, 1051-52 (La. 1981). On appellate review of a sentence, the relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. State v. Thomas, 98-1144 (La. 10/9/98), 719 So.2d 49, 50 (per curiam).
For defendant’s second degree murder conviction, the trial court imposed the mandatory life sentence at hard labor without benefit of parole, probation, or suspension of sentence. See LSA-R.S. 14:30.1B. Four months later, after hearing extensive argument on whether the life sentence was excessive as applied to this | ¿particular defendant, the trial court denied the motion to reconsider sentence. Defendant argues in brief that LSA-R.S. 14:30.1A(3) as applied to him is unconstitutional because it was Flavia who purchased the heroin and then later ingested it on her own and he (defendant) merely carried the heroin into the house. Defendant suggests that to sentence him to life imprisonment without the possibility of probation or parole is a gross misinterpretation of the intent of the statute and, as such, he is a victim of the, legislature’s failure to assign sentences that are meaningfully tailored to, the culpability of the offender, the gravity, of the offense, and the circumstances of the case.[2]
In State v. Dorthey, 623 So.2d 1276, 1280-81 (La. 1993), the Louisiana Supreme Court opined that if a trial court was to find that the punishment mandated by LSA-R.S. 15:529.1 makes no "measurable contribution to acceptable goals of punishment” or that the sentence amounted to nothing more than “the purposeful imposition of pain and suffering” and is “grossly out of proportion to the severity of the crime”, the court has the option, indeed the duty, to reduce such sentence to one that would not be constitutionally excessive. In State v. Johnson, 97-1906 (La. 3/4/98), 709 So.2d 672, 676-77, the Louisiana Supreme Court reexamined the issue of when Dorthey permits a downward departure from the mandatory minimum sentences in the Habitual Offender Law. While both Dorthey and Johnson involve the mandatory minimum sentences imposed under the Habitual Offender Law, the Louisiana Supreme Court has held that the sentencing review principles espoused in Dorthey are not restricted in application to ■ the penalties provided by LSA-R.S. 15:529.1. See State v. Fobbs, 99-1024 (La. 9/24/99), 744 So.2d 1274 (per curiam); State v. Collins, 09-1617 (La.App. 1 Cir. 2/12/10), 35 So.3d 1103, 1108, *1124 writ denied, 10-0606 (La. 10/8/10), 46 So.3d 1265.
There is no need for the trial court to justify a sentence under LSA-C.Cr.P. art. 894.1 when it is legally required to impose that sentence. As such, the failure to particulate reasons as set forth in Article 894.1 when imposing a mandatory life sentence is not an error; articulating such reasons or factors would be an exercise in futility since the court has no discretion. State v. Felder, 00-2887 (La.App. 1 Cir. 9/28/01), 809 So.2d 360, 371, writ denied, 01-3027 (La. 10/25/02), 827 So.2d 1173. See State v. Ditcharo, 98-1374 (La.App. 5 Cir. 7/27/99), 739 So.2d 957, 972, writ denied, 99-2551 (La. 2/18/00), 754 So.2d 964; State v. Jones, 31,613 (La.App. 2 Cir. 4/1/99), 733 So.2d 127, 146, writ denied, 99-1185 (La. 10/1/99), 748 So.2d 434; State v. Williams, 445 So.2d 1264, 1269 (La.App. 3 Cir.), writ denied, 449 So.2d 1346 (La. 1984).
Mandatory sentences have been repeatedly upheld as constitutional and consistent with the federal and state constitutional provisions prohibiting cruel, unusual or excessive punishment. See State v. Jones, 46,758, 46,759 (La.App. 2 Cir. 12/14/11), 81 So.3d 236, 249, writ denied, 12-0147 (La. 5/4/12), 88 So.3d 462. To rebut the presumption that the mandatory minimum sentence is constitutional, a defendant must clearly and convincingly show that he is exceptional, which means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Johnson, 709 So.2d at 676.
Defendant devotes most of his excessive sentence argument to the proportionality doctrine and cites to, in particular, Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). As noted by defendant in brief, in Solem (a recidivist statute case wherein the defendant was sentenced to life imprisonment because of six prior felony convictions), the Supreme Court, in applying a proportionality analysis, found the defendant’s life sentence without the possibility of parole significantly disproportionate to his crime and, as such,.prohibited by the Eighth Amendment. The Solem Court, 463 U.S. at 292, 103 S.Ct. at 3011, found that a court’s proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the |7penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.
Eight years later in Harmelin, the defendant was sentenced to life imprisonment without parole for possession of more than 650 grams of cocaine. Writing for the majority in Harmelin, Justice Scalia found that while Harmelin’s claim that his sentence is unconstitutional because of its mandatory nature finds some support in the so-called “individualized capital-sentencing doctrine” of the Court’s death penalty jurisprudence, that doctrine may not be extended outside the capital context because of the qualitative differences between death and all other penalties. Thus, according to Justice Scalia, there is no proportionality requirement in the Eighth Amendment. Harmelin, 501 U.S. at 985-94, 111 S.Ct. at 2696-2701.
In State v. Mitchell, 96-1896 (La.App. 1 Cir. 6/20/97), 697 So.2d 22, 25, writ denied, 97-1988 (La. 1/9/98), 705 So.2d 1098, this court found that the Supreme Court in Harmelin cast serious doubt on the viability of the Solem v. Helm analysis. We continued:
*1125 The Supreme Court reexamined this area of the law and upheld a sentence of life imprisonment without possibility of parole for a defendant convicted of possessing more than 650 grams of cocaine. In doing so, although a majority could not agree on the exact standard to employ, the Supreme Court limited the instances in which a complete Solem v. Helm proportionality analysis is required. [Footnote omitted]. As a result, courts are required to conduct the proportionality analysis required by Solem v. Helm only if, after comparing the gravity of the offense against the severity of the sentence, the court infers that the sentence is “grossly disproportionate” to the offense. State v. Wimberly, 618 So.2d 908, 913 (La. App. 1st Cir.), writ denied, 624 So.2d 1229 (La. 1993) (citation omitted).
Mitchell, 697 So.2d at 25.
In State v. Lindsey, 99-3256, 99-3302 (La. 10/17/00), 770 So.2d 339, 341, cert. denied, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001), our supreme court held that, despite the defendant’s assertion that mitigatory factors were important based on Solem, the mandatory life sentence imposed by the trial court was not excessive under Johnson. In footnote 2, the Lindsey court opined:
We note that the holding of Solem has been called into question by the Supreme Court’s later opinion in Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), which held that the fact that the sentencing judge was statutorily required to impose a life [ 8sentence without possibility of parole and could not take into account the particularized circumstances of the crime and the criminal, including such mitigating factors as the accused’s lack of any prior felony convictions, did not make the sentence “cruel and unusual” under the Eighth Amendment.
Lindsey, 770 So.2d at 344 n.2.
In support of the disproportionate impact that the mandatory life sentence has on his particular situation, defendant suggests that the “outcome” of this case is contrary to the legislative intent underpinning LSA-R.S. 14:30.1A(3), Defendant notes that in May of 1987, Senator William Jefferson proposed and presented Senate Bill No. 191 to the Senate Committee on the Judiciary, and that the minutes from the committee meeting provided the following:
Senator Jefferson stated that the bill provides that if a person sells a drug which results in death of the buyer, that seller could be charged with second degree murder. Senator Jefferson explained that the District Attorney association had some language he wished to incorporate in the bill. Mr. Robert Davidson, of the DeSoto Parish Sheriffs Office, representing the Louisiana Sheriffs Association, spoke in support of the bill. Senator Jefferson moved that Senate Bill No. 191 be reported favorably, and without opposition it was so reported.
Defendant then states in brief:
Senator Jefferson’s legislative intent is critically important. His choice of words clearly shows that he contemplated, and had the foresight to avoid, grossly unjust outcomes such as the one involved in this case. The legislative intent of the bill was to give law enforcement and prosecutors a new weapon against the drug trafficking industry, and specifically those who sold drugs. It was not intended to apply to tragedies such as the one that occurred in this case.
Defendant’s assertion notwithstanding, legislative intent is looked at only when the words of the statute are not clear or *1126 are ambiguous. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. LSA-C.C. art. 9. Regarding interpretation, LSA-R.S. 14:3 provides:
The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision,
Louisiana Revised Statutes 14:30.1A(3) provides, in pertinent part:
A. Second degree murder is the killing of a human being:
[[Image here]]
(3) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I through V of the Uniform Controlled Dangerous Substances Law, or any combination thereof, which is the direct cause of the death of the recipient who ingested or consumed the controlled dangerous substance.
“Distribute” means to deliver a controlled dangerous substance whether by physical delivery, administering, subterfuge, furnishing a prescription, or by filling, packaging, labeling or compounding the substance pursuant to the lawful order of a practitioner. LSA-R.S. 40:961(14). “Dispense” means to deliver a controlled dangerous substance to the ultimate user or human research subject by or pursuant to the lawful order of a practitioner, including the packaging, labeling, or compounding necessary to prepare the substance for such delivery. LSA-R.S. 40:961(13). “Deliver” or “delivery” means the transfer of a controlled dangerous substance whether or not there exists an agency relationship. LSA-R.S. 40:961(10).
Thus, while in 1987, Senator Jefferson may have indicated a desire to target sellers of drugs with an amendment to the second degree murder statute, the end result, that is, the statutory provision that was signed into law in this state, provides for a much larger class of offenders than just sellers. Under the statute, an offender is anyone who unlawfully distributes or dispenses a controlled dangerous substance. Thus, anyone who simply physically delivers a proscribed drug under Title 40 to a person who uses that drug; or anyone who administers a drug under Title 40 to a user, has violated LSA-R.S. 14:30,1A(3). Under these definitions, defendant was both a distributor and dispenser of cocaine and heroin, actions which resulted in the death of Flavia, who ingested or consumed the cocaine and heroin. While defendant suggests in brief that the punishment of life imprisonment placed upon him is “grossly disproportionate to the crime he committed,” we believe that this particular defendant, along with his actions, is the type of offender the statute meant to address.
Defendant suggests in brief that at Fla-via’s mother’s house, he merely returned the heroin to Flavia, which she had bought, not him. He further insists that he did not inject Flavia on the night in question. “Even if he had done so,” defendant continues in brief, “it is undisputed that the decedent and [he] were both drug addicts, and the 11(ldecedent was at all times a willing participant in the events that led to her tragic death.” Defendant concludes that there is “not one scintilla” of evidence that he intended to kill Flavia.
*1127 At the outset, it must be pointed out that LSA-R.S. 14:30.1A(3) contains no “intent to MU” element. The only intent required under this statute is that which is already a part of the underlying felony of unlawfully distributing or dispensing a controlled dangerous substance. In this respect, LSA-R.S. 14:30,1A(3) and LSA-R.S. 14:30.1A(4) are very similar to the felony murder provision of the second degree statute, wherein the offender commits second degree murder if engaged in the perpetration or attempted perpetration of one of the enumerated felonies “even though he has no intent to Mil or to inflict great bodily harm.”. See LSA-R.S. 14:30.1A(2).
As noted, under the statute, an offender is not only someone who sells or buys drugs. The class of offenders is anyone who distributes or dispenses. Moreover, the trial record indicates that defendant purchased the heroin and brought it with him to Christina’s house. In any event, regardless of who bought the heroin, it was undisputed at trial that defendant, at least once, injected Flavia in the arm with heroin, and then later administered another dose of heroin to Flavia anally, because the only needle they had had broken off in Flavia’s arm. It was further undisputed that defendant, at least once, injected cocaine into Flavia’s arm. Two medical experts testified at trial that Flavia died from respiratory depression due to heroin overdose.
Defendant admits that Flavia took more heroin when she was at her mother’s house (after she and defendant left Christina’s house), but alleges she injected herself with the heroin. Christina testified that she and Flavia were very close friends and that she had never seen Flavia inject herself with a drug. Given the actions of defendant in the few hours prior to this final injection of heroin, the jury could have reasonably concluded that defendant was lying about .Flavia having injected herself. The record is clear that defendant bought and sold a variety of drugs prior to Fla-via’s death and, two weeks after Flavia’s death, he was out selling drugs again, including heroin.
Accordingly, despite defendant’s assertion of his alleged unique position under the facts of this case, there is nothing particularly unusual about defendant’s 11, circumstances that would justify a downward departure from the mandatory sentence under LSA-R.S. 14:30.1B. See State v. Hano, 05-2090 (La.App. 1 Cir. 6/9/06), 938 So.2d 181, 188-91, writ denied, 06-1713 (La. 1/26/07), 948 So.2d 164. (affirming the defendant’s conviction for second degree murder under LSA-R.S. 14:30.1A(3), based in part on the testimony of a witness who saw the defendant “deliver to, T.JJ. [the victim who died] two pills” of methadone and, as such, this testimony established the defendant distributed methadone to the victim); State v. Kott, 11—0997 (La.App. 1 Cir. 2/10/12), 2012 WL 602425 (unpublished), writ denied, 12-1221 (La. 11/21/12), 102 So.3d 53, (affirming the defendant’s conviction for second degree murder, where the defendant admitted in a statement that he injected the victim with “K4 Dilaudids,” yet denied at trial that he injected the victim with anything on the day of the incident or at any other time). See also State v. Corbett, 04-1124 (La. 11/15/04), 888 So.2d 764 (per curiam); State v. Smith, 04-1123 (La. 9/24/04), 885 So.2d 508 (per curiam); Pena v. State, SC02-2411 (Fla. 2/24/05), 901 So.2d 781 (affirming the defendant’s conviction for first degree murder by drug distribution based on a statute similar to our own, where Mirranda Fernandes and a' girlfriend visited the defendant at his apartment, the defendant gave Mirranda heroin, and Mirranda took the heroin, and died); Hulme v. State, S00A2059 (Ga. 3/19/01), *1128 273 Ga. 676, 544 S.E.2d 138 (affirming the defendant’s conviction for felony murder based on the underlying felony of distributing a controlled substance, where the defendant gave dosages of methadone, for which the defendant had a prescription, to the victim who died).
The record before us clearly established a factual basis for the sentence imposed. Defendant has not shown by clear and convincing evidence that he is exceptional such that a mandatory life sentence would not be meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. See Johnson, 709 So.2d at 676. Accordingly, no downward departure from the presumptively constitutional mandatory life sentence is warranted. The sentence imposed is not grossly disproportionate to the severity of the offense and, therefore, is not unconstitutionally excessive. See Hano, 938 So.2d at 194 (upholding the constitutionality of life sentence without parole despite the defendant’s claim that her | ^action of giving four methadone pills to Crystal instead of to the victim had a mitigating effect). See also Kott v. Cain, 2014-953 (E.D. La. 10/26/15), 2015 WL 10766762 (upholding the state court’s rejection of the defendant’s claim that the second degree murder statute, specifically LSA-R.S. 14:30.1A(3) and (4), was unconstitutional as applied to his case by providing for a mandatory life sentence).
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant argues that during the jury instructions, the trial court erred in omitting part of the statutory definition of criminal negligence.
One of the responsive verdicts for the jury to consider was negligent homicide, defined as the killing of a human being by criminal negligence. See LSA-R.S. 14:32A(1). Louisiana Revised Statutes 14:12 provides: “Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.” The trial court provided the following jury charge regarding criminal negligence: “Criminal negligence exist [sic] when there is such disregard of the interest of others that the offenders [sic] conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under similar circumstances.”
The trial court, thus, omitted the language “although neither specific nor general criminal intent is present” (and substituted “person” for “man” and “similar” for “like”). Defendant argues in brief that the trial court’s failure to include the “intent” language was highly prejudicial to him since intent was a primary issue during the trial, and the error resulted in his not getting a fair trial.
Both parties at a jury charge conference made their concerns and objections known about any of the language the trial court planned to use in its jury instructions. Defendant did not raise any issues or concerns at the conference regarding the trial court’s proposed definition of “criminal negligence”; nor did defendant object at trial h.qwhen the trial court defined “criminal negligence” during its jury instructions. The failure to make a contemporaneous objection to jury instructions waives review of those jury instructions on appeal. See LSA-C.Cr.P. art. 801C; LSA-C.Cr.P. art. 841; State v. *1129 Draughn, 05-1825 (La. 1/17/07), 950 So.2d 583, 622, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
We are mindful that jury instructions may be reviewed on appeal despite the lack of a contemporaneous objection when the alleged error violates a fundamental due process right. See State v. Johnson, 98-1407 (La.App. 1 Cir. 4/1/99), 734 So.2d 800, 806-07, writ denied, 99-1386 (La. 10/1/99), 748 So.2d 439. We find that the removal of the “intent” language had little to no effect on the meaning of “criminal negligence.” The revised definition read by the trial court would have left the jury with the correct impression that criminal negligence requires no intent, which is what the removed language indicates in the first instance. In any case, the definitions of “negligent homicide” and “criminal negligence” were clear and concise and would not have so confused the jurors that defendant was denied a fair trial. The unanimous second degree murder guilty verdict suggests the jury found that the actions and behavior of defendant throughout the night that Flavia died rose to a level of culpability beyond that of mere criminal negligence.
Further, the omission here was not an erroneous misstatement of the essential elements of the charged offense. See Johnson, 734 So.2d at 807 (finding that the alleged erroneous instruction related only to an element of a responsive verdict, rather than to the definition of the offense charged and, as such, it was not apparent that the erroneous instruction fundamentally affected the fairness of the proceedings and accuracy of the factfinding process). While the “intent” language was not cited to the jury regarding the responsive verdict of negligent homicide, we do not find that the alleged error was structural; as such, it necessarily was not of such significance as to have violated fundamental requirements of due process. See State v. Hongo, 96-2060 (La. 12/02/97), 706 So.2d 419, 421-22; State v. Woods, 00-2147 (La. App. 1 Cir. 5/11/01), 787 So.2d 1083, 1096-97, writ denied, 01-2389 (La. 6/14/02), 817 So.2d 1153.
| ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, defendant argues he was denied effective assistance of counsel. Specifically, defendant contends that his defense counsel failed to object to extraneous information read to the jury by the trial court in response to a question it submitted during deliberations.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. A claim of ineffectiveness of counsel is analyzed under the two-pronged test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish that his trial attorney was ineffective, the defendant must first show that the attorney’s performance was deficient, which requires a showing that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. Secondly, the defendant must prove that the deficient performance prejudiced the defense. State v. Serigny, 610 So.2d 857, 859-60 (La.App. 1 Cir. 1992), writ denied, 614 So.2d 1263 (La. 1993).
In evaluating the performance of counsel, the inquiry must be whether counsel’s assistance was reasonable considering all the circumstances. State v. Morgan, 472 So.2d 934, 937 (La.App. 1 Cir. 1985). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. State v. Robinson, 471 So.2d 1035, 1038- *1130 39 (La.App. 1 Cir.), writ denied, 476 So.2d 360 (La. 1985).
■ A claim' of ineffective assistance of counsel is more properly raised by an application for post-conviction relief in the district court where a full evidentiary hearing may be conducted. However, where, as is the case here, the record discloses evidence needed to - decide the issue of ineffective assistance of counsel, and that issue is raised by assignment of error on appeal, the issue .may be addressed in the interest of judicial economy. State v. Carter, 96-0337 (La.App. 1 Cir. 11/8/96), 684 So.2d 432, 438. See Strickland, 466 U.S. at 687, 104 S.Ct. at 2064.
■| ^During deliberations, the jury sent a note to the trial court, asking for definitions of second degree murder and negligent homicide. The trial court brought out the jury and reread ■ sections of the jury instructions, particularly those pertaining to second degree murder and negligent homicide.
Defendant’s contention in brief is that trial- counsel was ineffective for failing to object to the trial court when it read (again) to the jury the definitions of “distribute,” “dispense,” “deliver or delivery,” and “direct ■ cause.” According to defendant, the jury asked only for the definitions of “second degree murder” and “negligent homicide,” not the definitions of the words contained in these statutes. Defendant suggests that this1 allowed the trial court to read the wrong definition again of “criminal negligence.”
Defendant’s claim is baseless. As already noted in the second assignment of error, the abridged version of the definition of the responsive verdict of “criminal negligence” would not have confused the jury in any meaningful way so as to deprive defendant of a fair trial. Further, we fail to see how allowing the trial court to again define the words that-are used to define “second degree murder” and “negligent homicide” would constitute ineffective assistance of counsel. Without proper exposition of thése words, some of which are legal terms of art, a jury would have little guidance working through the definitions, and all of the attendant elements, of these crimes during deliberations. Further, even if defense counsel’s failure to object did constitute deficient performance, there has been no showing made by defendant that such deficient performance in any way prejudiced the defense. See Serigny, 610 So.2d at 869-60.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error, defendant argues the trial court erred in admitting other crimes evidence at trial.
The State- filed a notice of intent to introduce other crimes evidence, and defendant filed an opposition to it. At a pretrial Prieur hearing,[3] testimony by | ^Detective Sergeant Rob-Chambers, with the East Baton Rouge Parish Sheriffs Office, revealed that within two weeks of Flavia’s death, defendant was texting people, trying to sell heroin. These phone texts also indicated that defendant was using his own. product (heroin) that he was trying to sell.
Detective Todd Bourgeois, with the Ascension Parish Sheriffs Office, testified at the Prieur hearing that in April of 2013, a confidential informant went to defendant’s house.in Gonzales (where defendant lived prior to moving to Denham Springs) and purchased methamphetamine from defendant. Within twenty-four hours, a search warrant was obtained and' executed at de~ *1131 fendant’s house. The police there found drug paraphernalia and drugs, including methamphetamine and steroids. Defendant’s iPhone was also seized. A forensic analysis on the cell phone revealed texts, as far back as December of 2012, sent by defendant to people to whom he was selling drugs or trying to sell drugs. The drugs included marijuana and heroin.
About two months after the Prieur hearing, the trial court provided its ruling in writing on what other crimes evidence the State would be permitted to introduce. The written judgment provided in pertinent part:
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the State of Louisiana is allowed to offer the following evidence of other acts, submitted in its Notice of Intent to Introduce Other Crimes Evidence, at the defendant’s trial to establish the defendant’s intent, absence of mistake or accident:
1. The selling of methamphetamine to a confidential informant on April 8, 2013.
2. The defendant’s arrest on April 9, 2013 and fruits of the execution of the search warrant for defendant’s residence which occurred also on April 9, 2013.
3. The defendant’s distribution of controlled dangerous substances, including heroin, from December 2012 until the date of arrest for Second Degree Murder on August 9, 2013.
Defendant argues that the State “knew full well” it could not prove its case against him without exposing the jury to other acts allegedly committed by him in order to destroy his character. Defendant further asserts in his brief that the probative value of this other crimes evidence was minimal or non-existent since he admitted to law enforcement that he administered at least one drug “to the decedent” the night she died.
h?At trial, defendant’s drug transaction with the confidential informant was not addressed or discussed. However, Detective Bourgeois testified at trial about the various drugs and drug paraphernalia that was found at defendant’s house upon execution of the April 9, 2013 search warrant. During the search, members of the Ascension Parish Sheriffs Office Narcotics Division found the following: methamphetamine in a cigarette pack (on defendant’s person); a glass methamphetamine smoking pipe with residue in it on the bed in defendant’s bedroom; a safe in the corner of defendant’s bedroom that contained numerous red and clear plastic baggies, and a clear pill with white powder inside; a trapdoor on the floor just inside defendant’s bedroom contained a toolbox, which contained many old syringes, an empty pack of suboxone, and some needles that had been disposed of; behind the home’s air-conditioning unit at the end of the hallway, a plastic bag with three glass vials of testosterone and a hypodermic needle; a small plastic box on the coffee table in the living room that contained suspected methamphetamine residue; a glass marijuana smoking bong in the dining room; a silver digital scale in a kitchen drawer; a methamphetamine smoking pipe, a viagara pill, and two carisoprodol pills in the center console of the defendant’s truck; and a propanolol pill on the couch. The pills were identified by the crime laboratory as pro-pranolol HCL, carisoprodol, and sildenafil citrate. Defendant’s iPhone was also seized.
Gerald Wilton, a forensic examiner with the Ascension Parish Sheriffs Office, testified at trial that he examined the contents of defendant’s iPhone. Among the thousands of texts found on defendant’s cell phone, several were pulled by the State *1132 and introduced into evidence. These texts were sent in December of 2012 and March and April of 2013 by defendant’s phone to several identified, and a few unidentified, recipients of the messages. A December 29, 2012 text stated, “I got rs need to sale[.]” A March 6, 2013 text stated, “N I got a sack of green for u[.]” A March 17, 2013 text stated, “I got a piece for u[.]” An April 2, 2013 text asked, “You want any dog food[?]” Another April 2, 2013 text asked, “What u been craving?” Another April 2, 2013 text stated, “Tryn [sic] to make it home we stoped [sic] by laburge to pick up some green 11sfor Cathy[.]” An April 3, 2013 text asked, “You want a g? Right[.]” An April 4, 2013 text stated, “I still have that g if u or ya bro want it[.]”
Detective Bourgeois testified at trial that when heroin is being sold on the street, it is referred to by many names, including “H” and “dog food.” Detective Bourgeois testified at the Prieur hearing that the term “green” referred to marijuana.
Gerald Wilton also found images (pictures taken by the cell phone user) on defendant’s cell phone, three of which were copied (and blown up) and introduced into evidence. One picture is a close-up of a hand, holding fanned-out one-hundred dollar bills. There appear to be about thirty-five bills. Another picture is a close-up of high-grade marijuana. The last picture is a close-up of a baggie of crystal methamphetamine on top of a digital scale, with a readout of 1.6 grams.
On August 10, 2013, about two weeks after Flavia’s death, defendant was brought in for questioning. The cell phone defendant had with him on that day was seized and a search warrant was obtained to search the contents of the phone. Corporal Steve Kemp, a computer forensic analyst with the East Baton Rouge Parish Sheriffs Office, testified at trial. Corporal Kemp obtained from defendant’s phone several texts sent by defendant on August 8 and August 9 to someone identified as “Glyn.”
Following are some of those relevant texts from these two dates:
It’s comparison is like three lines of 12s to one of my boys that honest as fu*k its really like that ill hook u up please holla at me idk [sic] anyone else that dose [sic] it besides people that sell it already of course lol
I already know u done got high again which is all good be [sic] I also did yesterday ok and I had to buy $200 worth to be able to get it! And the point of me telling u this is that I really want u to try this sh*t! Seriously it’s one chunk and fu*king crazy fire!!!!! Like real sh*t I’m stressing the fu*k out of this exsplaining [sic] how awsome [sic] this sh*t is!!!!!! Hit me up and ill meet u n let u try it but I have got to get some of my money I spend on it that’s the only reason I can’t just hold on to it
It’s so potion [sic] that I just did have [sic] of what I had out for u when u got to my house... And gabby I’m on side of road n c [sic] I can’t see lol
I just picked it up for u and all he would only do a bill worth [.] he told me he’ll hook me up for a bill so that’s what I did and he gave me two big chunks for it! So what you wanna do
^J^Ight [sic] I got two big chunks for a bill
Please baby help me and u can do what ever with each pack I just want the 50
This is the best h could pos [sic] get lol honestly unless it would be dangerous deadly
I’m [sic] bought to get rid of it been trying to wait on u
You want this sh*t or not
*1133 I’m at work right by the interstate in preirville [sic] so call me when u wake up and come get this
I got 4 fifty packs chunky
Detective Sergeant Chambers testified at trial that heroin is known on the street by several names, including “H” and “Chunky.” At the Prieur hearing, Detective Sergeant Chambers made clear that these August 8 and 9 texts sent by defendant were about defendant selling heroin. One pertinent exchange was as follows:
Q. When you see the word chunky, what does that mean to you?
A. That could—not all terms are street slang. Some could be just a term that him and the person he’s talking to understand, but he refers to it as H, which is a very common term for heroin. In fact, he says it’s the best H could possibly get. It’s so potent, it could be dangerous and deadly. Now, I’m paraphrasing that—that conversation right there. If I had it in front of me, I could read it word for word for you, but it’s very obvious to me that he is discussing the sale of heroin.
Q. So, when he—you testified earlier that he said in a text that he had four 50 packs chunky. Based on your experiences, what did that mean to you?
A. He has—he has it broken down into four bags, 50 dollars apiece, of heroin.
Generally, evidence of criminal offenses other than the offense being tried is inadmissible as substantive evidence because of the substantial risk of grave prejudice to the defendant. In order to avoid the unfair inference that a defendant committed a particular crime simply because he is a person of criminal character, other crimes evidence is inadmissible unless it has an independent relevancy besides simply showing a criminal disposition. State v. Lockett, 99-0917 (La.App. 1 Cir. 2/18/00), 754 So.2d 1128, 1130, writ denied, 00-1261 (La. 3/9/01), 786 So.2d 115.
Louisiana Code of Evidence article 404B(1) provides:
| ¡^Except as provided in Article 412, evidence of other crimes, -wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such.purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. LSA-C.E. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. LSA-C.E. art. 403. A trial court’s determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Freeman, 07-0470 (La.App. 1 Cir. 9/14/07), 970 So.2d 621, 625, writ denied, 07-2129 (La. 3/14/08), 977 So.2d 930.
We find the trial court did not abuse its discretion in allowing the State to intro *1134 duce .other crimes evidence at trial. In State v. Scott, 08-2418 (La.App. 1 Cir. 6/19/09), 20 So.3d 1089, 1091-96, reversed, 09-1658 (La. 10/22/10), 48 So.3d 1080 (per curiam), the defendant was charged and convicted of attempted possession with intent to distribute cocaine and attempted illegal carrying of weapons. The police used confidential informants to purchase crack cocaine from the defendant at a Sli-dell residence on three different dates. On April 25, 2007, a combined task force of law enforcement officers searched the residence and found crack cocaine in two of the bedrooms. The defendant complained on appeal that evidence of the three drug transactions (which did not form the basis of the instant charged drug offense), two of them over a month before the task force raid, were impermissible other crimes evidence. This court agreed and reversed the defendant’s convictions and vacated the sentences. However, in State v. Scott, 09-1658 (La. 10/22/10), 48 So.3d 1080, 10851 (per curiam), the supreme court reversed our decision and reinstated the defendant’s convictions and sentences. The supreme court found that the three prior drug sales at the house were plainly relevant to the question of whether the defendant intended to distribute the cocaine, an essential element of the offense charged.
The supreme court in Scott further opined:
Evidence of the prior sales was also relevant for another purpose. Defendant sought to dissociate himself from the Hailey Street address to the greatest extent possible, portraying himself as a sometime visitor and thus someone who would not likely have had either actual or constructive possession of the cocaine or the firearms found in the residence. Evidence that the surveillance team had personally observed defendant at the residence on March 13 and then again a month later on April 24 underscored the opinion of Sergeant Ohler that the cellular phone bill addressed to defendant at the Hailey Street address and found on the floor of the master bedroom next to defendant on the bed where the officers found him meant that he lived there, increasing the odds that he possessed the cocaine and firearms, and thus directly contradicted the testimony offered by defendant and Peggy Rudolph and their innocent explanation for why defendant’s name appeared on the bill.
Scott, 48 So.3d at 1086.
Evidence in the instant matter that defendant possessed an array of drugs and that he purchased and sold heroin (as well as marijuana and other drugs) was admissible as other crimes evidence at trial to show defendant’s intent and opportunity. We find, in particular, that defendant’s dealing in heroin established absence of mistake or accident. See LSA-C.E. art. 404B(1). The Scott court noted that prior drug sales from the Slidell residence was relevant because the defendant had sought to dissociate himself from that address to the greatest extent possible, “portraying himself as a sometime visitor and thus someone who would not likely have had either actual or constructive possession of the cocaine or the firearms found in the residence.” Scott, 48 So.3d at 1086.
Similarly, defense counsel in the instant matter sought to portray defendant as an occasional user and abuser of drugs, but certainly not a dealer of drugs. In his opening statement, defense counsel compared defendant and Flavia to Romeo and Juliet and suggested that they were both just addicts “shooting each other up.” As the other crimes evidence revealed, however, defendant was a drug dealer, who used, bought and sold everything from steroids and marijuana to methamphetamine and 1 ooheroin. The evidence indicates that de *1135 fendant was not an innocent bystander, idly sitting by while Flavia injected her-' self. Additionally, evidence was presented that it was defendant, a dealer and buyer of heroin, who took Flavia to her friend’s house and injected Flavia with both heroin and cocaine. Despite defendant’s denial, the jury may have reasonably concluded, based on the evidence presented, that defendant injected Flavia one final time at her mother’s house. Whatever relationship existed between defendant and Flavia, it was an unhappy, volatile one, according to both Christina and Nancy Landa (Flavia’s mother who testified at trial). Christina’s testimony and statement to the police revealed the animosity defendant harbored toward Flavia. According to Christina, defendant thought Flavia was cheating on him, and it was his intent to get Flavia so high, that he would be able to wrest the truth from her. Christina also testified on direct examination, as follows:
Q. And you mentioned earlier that they were arguing. When did the arguments happen while they were at your house?
A. It’s—they were—they came in arguing already and they stayed arguing the whole time. And every time Jarret shot her up with any dope, it was like he was trying to use it as a truth serum on her or something and ask her 50 questions.
Q. So, every time he would shoot her, are you telling us that he would begin asking her questions?- -
A. Yes, sir.
Q. Was he asking questions nicely?
A. Not really, no.
Q. Okay. What was he asking her about?
A. Who she’s been cheating on him with and what she’s been doing when, in all actuality, most of the -time, she was with me at my house.
Christina’s recorded statement to the police was played for the jury. During the interview, Christina stated that, in the past, defendant had.,injected drugs ..into Flavia while she was asleep.
Based on the foregoing, we find no reason to disturb the trial court’s ruling that the other crimes evidence was admissible at trial to show intent and absence? of mistake or accident. The probative value of this relevant evidence was not substantially l^outweighed by the danger of unfair prejudice, confusion of the issues, or -misleading -the jury. See LSA-C.E. art. 403.
This assignment of error is without merit.
CONCLUSION
For the foregoing, reasons, we affirm defendant’s conviction,and sentence.,
CONVICTION AND SENTENCE AFFIRMED.

; Defendant states in this assignment of error that his sentence was unconstitutional pursuant to the Eighth Amendment and "thus, the Trial 'Judge erred in denying the Motion for Post Judgment Verdict of Acquittal and/or . Motion for New Trial as well as the Motion for Reconsideration of Sentence.” Defendant’s argument under this assignment of error is confined to the alleged illegality of his life sentence. There is no argument made or issue raised regarding the sufficiency of the evidence or why he would be entitled to a new trial.

. The Louisiana State Attorney General’s Office also filed a brief in this matter. See LSA-R.S. 13:4448. In responding only to the first assignment of error in the instant appeal, the Attorney General’s Office argues that LSA-R.S, 14:30.1A(3) is not unconstitutional and, as such, defendant’s life sentence does not violate the Eighth Amendment,

. State v. Prieur, 277 So.2d 126, 130 (La. 1973).