# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-1517

**STATE OF LOUISIANA**

**VERSUS**

**ROLAND CHAMBERS**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF VERMILION, NO. 42652,
HONORABLE BYRON HEBERT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS
JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses G. Thibodeaux, Chief Judge, Jimmie C. Peters, and J. David Painter, Judges.

**REVERSED AND RENDERED.**

**Painter, J., dissents and assigns written reasons.**

**Richard J. Putnam, III
Assistant District Attorney
Fifteenth Judicial District
Post Office Box 175
Abbeville, LA 70511-0175
(337) 893-0103
COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Peggy J. Sullivan
Louisiana Appellate Project
Post Office Box 2775
Monroe, LA 71207-2775
(318) 387-6124
COUNSEL FOR DEFENDANT/APPELLANT:**

**Roland Chambers**

**Roland Chambers**
**Pro Se**
**D.C.I. Post Office Box 788**
**Jackson, LA  70748**

PETERS, J.

The defendant, Roland Chambers, was originally charged by grand jury indictment with the offense of second degree murder, a violation of La.R.S. 14:30.1. After trial, a jury returned the responsive verdict of guilty of manslaughter, a violation of La.R.S. 14:31. Thereafter, the trial court sentenced the defendant to serve twenty years at hard labor. After the trial court rejected his motion to reconsider his sentence, the defendant perfected this appeal. In his appeal, the defendant raises two assignments of error through his attorney of record and three *pro se* assignments of error. For the following reasons, we reverse the defendant's conviction and enter a judgment of acquittal.

## DISCUSSION OF THE RECORD

There is little dispute over the facts giving rise to the defendant's conviction. The evidence established that on the afternoon of March 31, 2003, the body of Ryan Cassidy was found in a ditch in Erath, Louisiana. A subsequent autopsy revealed that Cassidy's body contained a long list of recently ingested and/or injected compounds, including marijuana, benzodiazepines, diazepam (Valium), nordiazepam, amphetamine, methamphetamine, ecstasy, methylenedioxyamphetamine, cocaine, oxycodone (OxyContin), and oxymorphone. Additionally, a number of fresh puncture marks in various stages of healing were present on Cassidy's arms.

The State of Louisiana (state) presented evidence with regard to how Cassidy came to be found in the ditch through the testimony of Nick Choplin, who, like the defendant and a third individual named Derrick Reaux, was initially charged with Cassidy's murder.[1] Choplin's undisputed testimony established that, on the day

---

[1] Although originally charged with second degree murder and distribution of a controlled dangerous substance, Choplin entered into a plea agreement with the state whereby the second degree murder charge was reduced to negligent homicide in exchange for a guilty plea to both charges. The trial court sentenced him to serve five years at hard labor on each count, but suspended

before Cassidy's body was found, Reaux telephoned him and asked for assistance in obtaining a forty or eighty milligram tablet of OxyContin. Choplin and Reaux were friends and had often used OxyContin together before that date. They would do so by crushing a tablet of the medication, melting the crushed substance in a spoon, and injecting it intravenously to acquire an instant "high" from the otherwise time-released pain medication.

At approximately 8:30 p.m. on March 30, 2003, Reaux and Cassidy arrived at Choplin's home. Reaux had not mentioned Cassidy in the prior telephone conversation, and, initially, Choplin was uncomfortable in discussing any purchase of an illegal substance in Cassidy's presence. However, Reaux satisfied Choplin's concerns, and soon thereafter the three men left Choplin's home in Reaux's vehicle in an attempt to obtain the OxyContin. Using Reaux's cellular telephone, Choplin made arrangements with the defendant, from whom he had purchased OxyContin in the past, to purchase one eighty milligram tablet.

The three men drove to a prearranged location where the defendant was waiting. After being provided with $40.00 by Reaux, Choplin then exited the vehicle and gave the money to the defendant in exchange for an eighty milligram tablet of OxyContin. Neither Reaux nor Cassidy exited the vehicle. Choplin then returned to the vehicle and gave the tablet to Reaux. The three men then returned to Choplin's home, arriving at approximately 9:45 p.m.

Immediately upon arriving at Choplin's home, Reaux obtained a spoon from the kitchen, and he and Cassidy went into the bathroom. They remained there for approximately ten minutes, and, when they exited the bathroom, Reaux handed

the sentences and placed Choplin on five years supervised probation. A condition of that probation was that he testify truthfully with regard to the defendant's involvement in Cassidy's death.

2

Choplin the spoon he had taken from the kitchen. Choplin observed that it was burned black on the bottom, a condition which Choplin accepted as evidence that Reaux and Cassidy had cooked the OxyContin tablet for intravenous injection. Reaux and Cassidy immediately left Choplin's house. The subsequent criminal investigation established that Cassidy died in Reaux's house sometime that night and that Reaux and his girlfriend disposed of the body by dumping it in the ditch.

After completion of the evidentiary stage of the trial, and after being instructed by the trial court concerning the principal charge of second degree murder as well as the possible responsive verdict of manslaughter, the jury returned a verdict finding the defendant guilty of manslaughter. After sentencing, the defendant filed a motion to reconsider his sentence, which the trial court rejected. The defendant then perfected this appeal.

**OPINION**

Louisiana Revised Statutes 14:30.1(A) provides a number of ways the offense of second degree murder can be committed, and it defines second degree murder as:

[T]he killing of a human being:

> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or

> (2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

> (b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.

> (3) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I or II of the Uniform

3

Controlled Dangerous Substances Law which is the direct cause of the death of the recipient who ingested or consumed the controlled dangerous substance.

(4) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I or II of the Uniform Controlled Dangerous Substances Law to another who subsequently distributes or dispenses such controlled dangerous substance which is the direct cause of the death of the person who ingested or consumed the controlled dangerous substance.

(Footnote omitted.)

That portion of the manslaughter statute applicable to the facts now before us is La.R.S. 14:31(A)(2)(a), which provides that "[m]anslaughter is . . . [a] homicide committed, without any intent to cause death or great bodily harm . . . [w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person . . . ."[2]

The defendant argues in his counsel's first assignment of error that the evidence presented by the state was insufficient to sustain a verdict of manslaughter. We agree that the facts presented at trial establish only that the defendant was engaged in a felony enumerated in La.R.S. 30.1(A)(4), the distribution of oxycodone.[3] Thus, the state failed to establish that he was engaged in any criminal activity other than that specifically listed in La.R.S. 30.1. However, our inquiry does not end with that conclusion.

In further evaluating this assignment of error, we note that the record establishes that the defendant did not object to the jury being instructed as to the

---

[2]Article 30 refers to La.R.S. 14:30, the first degree murder statute, and is not applicable to the facts before us.

[3]OxyContin contains oxycodone, which is a controlled dangerous substance listed in Schedule II of the Uniform Dangerous Substance Law. *See* La.R.S. 40:964.

responsive verdict of manslaughter. As stated in *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 251-52 (La.1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432 (1983):

> [I]f the defendant does not enter an objection [to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict] (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.

> It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object. Therefore, at least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.

Thus, because the state failed to establish the elements of manslaughter beyond a reasonable doubt, the issue before us is whether the state established the elements of second degree murder beyond a reasonable doubt such that the jury could have returned the "compromise" verdict.

The state's prosecution of the defendant was based on La.R.S. 14:30.1(A)(4). Thus, the state had to establish beyond a reasonable doubt that, although he had no specific intent to kill Cassidy, the defendant unlawfully distributed OxyContin to Choplin, who subsequently distributed that substance to another, and that the OxyContin was the direct cause of Cassidy's death.

The defendant does not dispute that he distributed the OxyContin to Choplin or that Choplin distributed the substance to Reaux. Instead, he argues that the state failed to establish that the OxyContin he distributed to Choplin was the direct cause of Cassidy's death. Specifically, he asserts that the state's evidence is circumstantial

5

with regard to whether Cassidy ingested and/or injected any portion of the OxyContin he distributed to Choplin or died from that particular substance. He argues that the facts presented do not exclude every reasonable hypothesis of innocense beyond a reasonable doubt as required by La.R.S. 15:438. We agree.

Louisiana Revised Statutes 15:438 provides with regard to circumstantial evidence that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." In addressing the issue of circumstantial evidence, the supreme court stated in *State v. Ortiz,* 96-1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied,* 524 U.S. 943, 118 S.Ct. 2352 (1998):

> When circumstantial evidence is used to prove the commission of an offense, La.R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test to be applied when circumstantial evidence forms the basis of a conviction; all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.

In attempting to establish the OxyContin distributed by the defendant as the direct cause of Cassidy's death, the state relied on the testimony of two experts, Dr. Edward Barbieri, a forensic toxicologist employed by National Medical Services, a Pennsylvania testing facility, and Dr. Emil M. Laga, a forensic pathologist and toxicologist. Dr. Laga performed the autopsy on Cassidy's body, and National Medical Services performed certain toxicology screening on blood samples obtained during the autopsy proceedings. However, the expert testimony is conflicting with regard to the effect of Cassidy's level of OxyContin as well as how that level might have been affected by the other substances present.

6

Dr. Barbieri provided the jury with the long list of compounds that Cassidy had recently ingested and/or injected into his body, including specifically, OxyContin. He testified that Cassidy's blood sample revealed a level of 400 nanograms of oxycodone (OxyContin) per milliliter of blood (nanog/mL) in his system at the time of his death. When asked about the lethal effect of that level, Dr. Barbieri suggested that the finding "could be" be within a lethal range but that the more typical lethal ranges of that substance rise into the thousands of nanog/mL. He did acknowledge that some studies involving individuals who were not used to using the substance by intravenous injection revealed lethal ranges as low as 500 nanog/mL. He suggested that, while such instances were uncommon, they had been documented as having occurred. However, in those instances, OxyContin was the only substance present in the individual's system.

According to Dr. Barbieri, the effect a particular substance might have on a specific individual could depend on such noninclusive factors as the individual's physical frame, body weight, sensitivity, or genetic makeup.[4] However, Dr. Barbieri was not asked whether a single eighty milligram tablet of OxyContin could produce a level of 400 nanog/mL in an individual. Although he testified that all of the substances present in Cassidy's body could have interacted to cause his death, he suggested that the person performing the autopsy would be in a better position to evaluate the effect of the combinations in an individual's system.

Dr. Laga performed the autopsy at a hospital in Abbeville, Louisiana, on the afternoon of March 31, 2003. Dr. Laga's autopsy findings added cocaine to the list of ingested and/or injected substances testified to by Dr. Barbieri, as he found that

---

[4]Dr. Laga's autopsy findings established that Cassidy was five feet, eleven inches tall at the time of his death and weighed 145 pounds.

Cassidy had ingested cocaine within twenty-four hours of his death. Dr. Laga disagreed with Dr. Barbieri's opinion concerning the potential effect of the other substances. He testified that the substances present, other than the OxyContin, had been present long enough to have either ceased to have any effect on his system or were at levels far below lethal or toxic levels. In his opinion, Cassidy died as a result of fluid buildup in the lungs and brain, which he credited to the presence of the OxyContin alone. Dr. Laga also disagreed with Dr. Barbieri's opinion concerning the effect of a 400 nanog/mL level of OxyContin. According to Dr. Laga, most people die if their OxyContin level reaches anything between 200 and 1,000 nanog/mL and that, in the case of Cassidy, OxyContin "was the last drug he took and the most killing drug he took." He specifically testified that an injected eighty milligram tablet would be sufficient to produce a lethal level of OxyContin and would produce a finding of 400 nanog/mL.

In addition to the conflicts raised by the state's expert evidence with regard to the effect of Cassidy's OxyContin level,[5] time sequence conflicts and unanswered questions also arose from the state's other evidence. Choplin's testimony established that Reaux and Cassidy left his home at approximately 10:00 p.m. on March 30, 2003. According to Choplin, both men "had a pretty intense buzz" when they left but otherwise "they looked the same." We interpret this to mean that they looked the same as they had when he first saw them that night in that they had initially "looked like they had been up for a while from the get go." Dr. Laga testified that Cassidy died between 12:00 midnight and 6:00 a.m. on March 31, 2003, or at least two hours

---

[5]We also note that the lay testimony on the effect of OxyContin conflicts with Dr. Laga's expert testimony. Choplin testified that, on March 30, 2003, he was deeply involved in using illegal substances and was ingesting "[g]ive or take, about three hundred sixty milligrams [of OxyContin] per day."

8

after he left Choplin's home. However, Dr. Laga also testified that, if Cassidy had injected himself with the full eighty milligram tablet, his substance level would have immediately risen to 380 to 570 nanog/mL and he would have lapsed into a deep coma within five minutes after the injection. He opined that fluid buildup in the lungs and brain would have begun within five to fifteen minutes and that, once this occurred, "you're never going to come back." However, according to the doctor, he could still "possibly" have survived in a coma for two hours.

While performing the autopsy, Dr. Laga observed a number of puncture marks on Cassidy's arms, which he considered consistent with intravenous injection sites. Some were scabbed over, indicating to the doctor that they could have been present for as long as one week. However, eight appeared to be injection sites which were less than twenty-four-hours old. The doctor could not determine how many of the sites were successful injections. According to the doctor, it could have been as little as one or as many as eight. Additionally, Dr. Laga testified that the lethal level could have been reached had Cassidy injected himself with forty milligrams of OxyContin at times in close proximity to each other.

Thus, while the evidence establishes beyond a reasonable doubt that the defendant distributed an eighty milligram tablet of OxyContin to Choplin, that Choplin distributed that substance to Reaux, and that Reaux and Cassidy converted the substance for intravenous use in Choplin's bathroom, the evidence does not establish what amount of that tablet of OxyContin Cassidy injected and does not exclude the possibility of Cassidy having ingested more OxyContin from a different source following the episode in Choplin's bathroom.

Given the conflicting expert testimony regarding the effect of the level of OxyContin present in Cassidy, the lack of evidence concerning exactly what occurred in Choplin's bathroom, the presence of eight recent puncture marks on Cassidy's arm, and Dr. Laga's testimony concerning the possibility of Cassidy injecting himself twice within a short period of time, we find that the state has failed to carry its burden of excluding every reasonable hypothesis of innocence as required by La.R.S. 15:438.

Viewing the direct evidence in a light most favorable to the state, a rational juror could believe Dr. Barbieri over Dr. Laga with regard to the effect of OxyContin and the other substances on an individual's system or could conclude that Cassidy shared the eighty milligram tablet with Reaux and later obtained an additional tablet. In either case, such a belief would preclude the state from carrying its burden of proof beyond a reasonable doubt as to every essential element of the crime. Specifically, such findings would preclude the proof of causation. That is to say, reasonable findings with regard to that evidence and permissible inferences did not exclude every reasonable hypothesis of innocence beyond a reasonable doubt as required by La.R.S. 15:438.

### DISPOSITION

For the foregoing reasons, we reverse the defendant's conviction for manslaughter and enter a judgment of acquittal.

**REVERSED AND RENDERED.**

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-1517


STATE OF LOUISIANA

VERSUS

ROLAND CHAMBERS


PAINTER, J., dissenting.

I respectfully dissent from the majority herein. I disagree with the majority's conclusion that the evidence adduced at trial does not exclude every reasonable hypothesis of innocence. There is no question but that Choplin bought OxyContin from Chambers on behalf of Cassity and Reaux. Thus, Chambers is a link in the distribution of the drug to Cassidy. Therefore, Chambers is a principal as defined by La.R.S. 14:24. Further, the circumstantial evidence indicates that Cassidy injected the drug soon after it was supplied to him. Edward Barbieri, the forensic toxicologist, deferred to the greater knowledge of the doctor performing the autopsy, Dr. Emile Laga, as to the effect of the various drugs found in Cassidy's blood. Dr. Laga credited Cassidy's death to OxyContin. He testified that the amount bought from Chambers was sufficient to produce the amount found in Cassidy's blood. Taking this evidence, both direct and circumstantial, in the light most favorable to the prosecution, it is sufficient to support the guilty verdict brought by the jury in this case. Accordingly, I would affirm Chambers' conviction.