# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #004

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **6th day of February, 2025** are as follows:

**BY Hughes, J.:**

2024-K-00897      STATE OF LOUISIANA  VS.  DEON RAY BARTIE (Parish of Allen)

AFFIRMED. SEE OPINION.

Weimer, C.J., dissents and assigns reasons.
Hughes, J., additionally concurs and assigns reasons.
Crain, J., dissents and assigns reasons.
McCallum, J., dissents and assigns reasons.
Guidry, J., concurs in the result.

## SUPREME COURT OF LOUISIANA

## No. 2024-K-00897

## STATE OF LOUISIANA

## VS.

## DEON RAY BARTIE

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Allen

**HUGHES, J.**[*]

In this case, the defendant's district court conviction for second degree murder, under La. R.S. 14:30.1(A)(3), as the provider of a drug implicated in the poly drug toxicity death of the victim, was reversed by the appellate court on the basis of insufficient evidence. We granted the writ application filed by the State of Louisiana and, for the following reasons, we affirm the appellate court.

## FACTS AND PROCEDURAL HISTORY

In **State v. Bartie**, 23-0780 (La. App. 3 Cir. 6/20/24), 389 So.3d 1024, the appellate court succinctly summarizes the facts, procedural history, and testimony presented to the district court, as follows:

> The facts of this case … involve the death of [Brittany] Lapeyrouse on September 19, 2018. … [O]n November 29, 2018, the Allen Parish District Attorney's Office filed a bill of information charging Defendant and two co-defendants with eighteen felony counts, including negligent homicide. …

[*] Justice Jeanette Theriot Knoll, retired, appointed Justice Pro Tempore, sitting due to the vacancy in Louisiana Supreme Court District 3.

[*]Judge John Michael Guidry, was appointed Justice ad hoc, sitting for Justice Scott J. Crichton, for oral argument. He sits as an elected Justice at the time this opinion is rendered.

… [T]he State[1] filed a superseding indictment charging Defendant alone with four felony counts: second degree murder, a violation of La. R.S. 14:30.1(A)(3); possession of methamphetamine with intent to distribute, a violation of La. R.S. 40:967(A)(l); possession of alprazolam, also known as Xanax, a violation of La. R.S 40:969(A)(l); and illegal carrying of weapons while in possession of controlled dangerous substances, a violation of La. R.S. 14:95(E). Defendant entered not guilty pleas to these charges ….

Jury selection began on June 12, 2023, and the jury began hearing evidence the next day. After a five-day trial, the jury found Defendant guilty as charged on all counts. On August 31, 2023, the trial court sentenced Defendant to life at hard labor for second degree murder; five years at hard labor for possession of methamphetamine; five years at hard labor for possession of alprazolam; and five years at hard labor for illegal carrying of weapons. All sentences were to be served concurrently.

* * *

On September 1[8], 2018, Defendant and the victim[2] were part of a group whose main pastime on the day was spent using illegal drugs. In addition to Defendant and the victim, the group comprised Amberly Bonin …, Chris Pitre …, and Michele Fontenot …. That day, the group gathered at the EconoLodge Motel … in north Lake Charles.

The State presented detailed testimony about the day's events from Bonin, Defendant's former girlfriend. Bonin testified that she met Defendant a few weeks before the incident at issue when he sold methamphetamine to her and a couple of friends …. Bonin further stated that she was friends with the victim, whom she had met months before the incident when both were jailed at the Calcasieu Correctional Center. Bonin testified that she introduced Defendant to the victim on September 17, 2018, when they were doing drugs at the Days Inn motel in Sulphur.

Bonin stated that on September 19, 2018, the victim came to the EconoLodge at 4:00 a.m. According to Bonin, the victim appeared to be fine when she arrived. Shortly thereafter, the victim left with a friend, and she returned at about 9:00 a.m. After the victim returned, Bonin witnessed the victim buy Xanax and methamphetamine from Defendant. Although Bonin saw the victim ingest Xanax, *she did not see the victim ingest methamphetamine*. Despite having those drugs, the victim also wanted to find heroin. Bonin testified that Fontenot … called some men in Welsh to purchase heroin. When the men arrived, Fontenot went to their car, bought heroin, and gave it to the victim. At about 10:30 a.m., the victim and Bonin snorted some of the heroin. Shortly thereafter, the pair went into the bathroom of the motel room. There the victim injected heroin into Bonin's arm; Bonin then started to wash her hair while the victim injected herself with the remainder of

---

[1] The Allen Parish District Attorney recused himself in the district court, and the Louisiana Office of the Attorney General ("the State") undertook the prosecution of the defendant, on the more serious second degree murder charge.

[2] According to the autopsy report, the victim was 24 years old, weighed 180 pounds, 65 inches in height, and exhibited venipunctures on the left antecubital space that may be consistent with track marks due to injection drug use.

2

the heroin. After the victim injected herself, she then stood up, but her knees gave way, and she fell to the floor, still breathing but unconscious.

Bonin sat down on the floor and tried to aid the victim. While Bonin held the unconscious woman, Fontenot obtained a bucket of ice and put some on the victim's neck. According to Bonin, Defendant was upset by these events because the incident was "ruining our day." The group decided to go to a "chalet" they had previously booked at the Coushatta Casino Resort … through their friend, Greg Fontenot …. Although the victim was unconscious, Bonin testified she was not worried; as a heroin user herself, she expected the victim to recover. Shortly thereafter, the group prepared to leave for the "chalet"….

When G. Fontenot arrived in a vehicle, the unconscious victim was placed in the vehicle, and Pitre and Bonin also got into the vehicle and left. Defendant and Fontenot got into a Lyft. After meeting up at an area filling station, where Defendant apparently engaged in a drug transaction with a woman Bonin did not recognize, the members of the group proceeded to their chalet at the Coushatta casino. Bonin testified that all the while they were in G. Fontenot's car, she kept checking the victim's nose and observed her chest rise and fall. In Bonin's own words, "My mind set [sic] is still she [the victim] is gonna come out of this you know like I said I have seen it before it happened to me. I was just waiting for her to come out of it."

When they arrived at the chalet at about 3:00 or 3:30 p.m., the victim was still unconscious but alive. At this point, members of the group carried the victim inside the chalet and put her on the couch. Bonin walked to the back bedroom and stayed there for a short time. When she walked back up front to check the victim's condition, she found that the unconscious woman's lips were blue. At approximately 4:17 p.m., Bonin called the Coushatta front desk in spite of Defendant's desire not to involve the authorities.

In the intervening time, Bonin removed drugs from the victim's purse to avoid trouble. The drugs in the purse included those sold by Defendant, but there was also suboxone. Bonin stated that although Defendant regularly had possession of suboxone, she did not remember seeing Defendant in possession of this drug that day and did not recall seeing Defendant sell any to the victim that day. Nevertheless, Bonin did recall Defendant being in possession of other drugs that day, including methamphetamine, Xanax, and marijuana, and he also had scales.

Within minutes of receiving the call from Coushatta's front desk, Barry Granger …, a member of the Coushatta Tribal Fire Department, arrived at the chalet. He testified that the victim was face down on the couch. According to Granger, the victim's body was cold, had no pulse, and she was not breathing. He also stated that there was vomit and foam coming from the victim's mouth. At this point, Granger began doing CPR and contacted the Allen Parish Ambulance Service ….

Shortly thereafter, Thomas Growth …, a paramedic with the Ambulance Service, took over CPR. After employing emergency procedures, he and his partner loaded the victim into the ambulance and proceeded to an area hospital at 4:35 p.m. Groth testified that the victim coded at the hospital at 4:59 p.m.

Under cross-examination, Bonin said that even though she and the victim were both heroin users, she never saw Defendant use heroin. Bonin also affirmed that the heroin she and the victim used during the time at issue was provided by Fontenot.

Upon re-redirect [sic] examination and during re-cross, Bonin explained terminology found in texts she sent to Defendant in September 2018. She asked Defendant if he had any "dro" or "ice" to sell. She testified that "dro" is marijuana and "ice" is methamphetamine. She reiterated that she saw Defendant sell methamphetamine and Xanax to the victim on the morning of the day of the latter's death.

Detective Scott LeBlanc …, of the Coushatta Tribal Police Department, echoed some of Bonin's testimony as he identified drug-related terminology found in texts made from Defendant's phone. Some of the terms referred to Xanax, methamphetamine, and Suboxone.

LeBlanc testified that during a search of the chalet investigators located syringes, a crystal-like substance, and a plastic wrapper that read "Suboxone." The search also uncovered the victim's coin purse which Bonin had placed in the drawer of an end table; besides finding the victim's identification card in the purse, he found a small orange baggie with a crystal-like substance and Suboxone. When investigators also found a gun in a cereal box, LeBlanc testified they left the chalet and obtained a new, more expansive search warrant.

After re-entering the chalet, the investigators located scales and substances that appeared to be drugs, including methamphetamine and Suboxone in a bag labeled with the victim's name. There was a white crystal-like substance wrapped in a tissue or paper towel in a coffee pot. Items found in the bedroom included orange baggies with a crystal-like substance and multiple pills inside them. Investigators also found apparent narcotics in a pants pocket in a dry-cleaning bag in the armoire in the bedroom. They also found a green leafy substance. Subsequent lab testing confirmed that the seized substances included methamphetamine, marijuana, alprazolam, Suboxone, Clonazepam, and Hydrocodone. According to LeBlanc, even though Defendant gave a statement in which he admitted owning the clothes hanging in the armoire and the gun found in the duffle bag in the bedroom, he denied any knowledge of narcotics.

Defendant introduced testimony from his friend Pitre, a drug user who was present during the relevant events …. Pitre testified that he saw the victim give heroin to Bonin four or five days before the victim died. On the [day before] the victim's death, Pitre, Bonin, and Defendant checked into a hotel on Highway 171 at about 11 a.m.; some other people arrived at some point, then the victim showed up at about 10 p.m. A few more people arrived, causing a crowded situation in the room. There were multiple people sitting on the two beds in the room. There was a continental breakfast in the lobby, and the victim began eating. After about twenty minutes, the victim left. Pitre testified that he did not see anyone give drugs to her during this interval, nor did he see her give drugs to anyone else. According to Pitre, when the victim left, she was gone for about six hours. On cross-examination, Pitre claimed he did not see any drugs when the party was packing up to

4

leave the hotel and did not see any drugs when the party unpacked at the chalet.

Defendant testified in his own defense. He testified that he, Bonin, and Pitre checked into the EconoLodge in the late afternoon before the victim's death. That evening, the victim, who was a friend of Bonin, joined them, and they got high on meth and weed, watched TV, and clowned around. He stated that he never sold Xanax or meth to the victim.

Defendant further testified that the victim and Bonin had an argument, and the victim left for approximately six hours. However, he later testified it could have been as little as a single hour. After the victim came back, she and Bonin went into the bathroom. He knocked on the door because it was checkout time; he then opened the door and saw that Bonin had the victim in her arms. When he asked what was wrong, Bonin told him the victim had injected herself with heroin. Bonin and Pitre carried the victim out of the bathroom; another woman who was present, Fontenot, rubbed the victim with ice and advised that they should call 911. According to Defendant, Bonin did not want to call 911 because she advised him that the victim would recover.

When another friend, G. Fontenot, arrived with a car, they loaded up to go to the chalet. He said some of the others loaded the victim in the car while he was taking a bath. The party proceeded to the chalet but stopped at a filling station on the way. When they arrived at the chalet, Bonin, Pitre, and G. Fontenot got the victim out of the car and put her on a couch in the chalet. Defendant and Bonin went to lay [sic] down; about thirty minutes after they arrived, Pitre entered his room to state the victim was throwing up. When they went to check, the victim had vomitus on the side of her face, and Bonin called for emergency services.

\* \* \*

… While **Bonin testified** that Defendant sold methamphetamine and Xanax to the victim, she stated **that she did see the victim consume the Xanax, but she did not see the victim consume the methamphetamine**. Further, the State's medical expert, Dr. Tape, did not identify the time the victim may have used the drugs. On re-direct examination, the State asked him if the levels of narcotics found in the victim's system were **consistent with ingestion earlier in the morning of the day of her death**. His answer was "**it could be**." Shortly before that, defense counsel asked Dr. Tape **whether the victim could have taken the drugs the day before her death**. Dr. Tape replied: "**Possibly and we get this thing [where] if you take more of [a] substance it will last longer in your system**."

To buttress its argument regarding the sufficiency of the evidence, the State notes a text message on Defendant's phone from September 19 suggested the victim wanted to buy seven grams of methamphetamine from him. Also, the State observes that police found methamphetamine packaged in the victim's coin purse in baggies similar to that found in Defendant's luggage. According to the State, this was the 1.62 gram quantity noted by the crime lab. The State then argues that the weight difference between seven grams purportedly requested from Defendant and 1.62 grams found in the victim's coin purse must logically represent the quantity the victim consumed.

5

(Emphasis added; footnotes omitted.)

The defendant sought review of only his second degree murder conviction, which the appellate court reversed and entered a judgment of acquittal, vacating the sentence as to the second degree murder charge. **State v. Bartie**, 23-0780 at p. 1, 389 So.3d at 1026. The State filed a writ application with this court, urging as its assignment of error: "The Third Circuit Court of Appeal erroneously applied the **Jackson** [**v. Virginia**] standard[3] in vacating the Appellant's conviction for second degree murder." We granted the application. **State v. Bartie**, 24-00897 (La. 9/17/24), 392 So.3d 326.

## LAW AND ANALYSIS

The defendant in this case was convicted by the district court, under La. R.S. 14:30.1(A)(3), which provides that "[s]econd degree murder is the killing of a human being … [w]hen the offender *unlawfully distributes or dispenses* a controlled dangerous substance listed in Schedules I through V[4] of the Uniform Controlled Dangerous Substances Law, or any combination thereof, which is the *direct cause of the death* of the *recipient who ingested or consumed* the controlled dangerous substance." (Emphasis added; footnote omitted.)

Evident from a plain reading of La. R.S. 14:30.1(A)(3) is that, in order to convict a defendant of this offense, the prosecution must present evidence to show

---

[3] **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

[4] The following substances were listed on the victim's toxicology report, as being present in her body at her death:
    (1) methamphetamine (an La. R.S. 40:964, Schedule II(C)(2) drug);
    (2) amphetamine (an La. R.S. 40:964, Schedule II(C)(1) drug, and a metabolite of
        methamphetamine);
    (3) fentanyl (an La. R.S. 40:964, Schedule II(B)(9) drug);
    (4) norfentanyl (a metabolite of fentanyl); and
    (5) morphine (an La. R.S. 40:964, Schedule II(A)(1)(o) drug, and a metabolite of heroin (an
        La. R.S. 40:964, Schedule I(B)(11) drug)).

6

that: (1) the defendant unlawfully distributed or dispensed a Schedule I through V controlled dangerous substance, or combination of substances, to the recipient/victim; (2) the recipient/victim ingested or consumed the controlled dangerous substance(s); and (3) the recipient/victim died as a direct cause of ingesting or consuming the controlled dangerous substance(s). See **State v. Hano**, 05-2090, p. 5 (La. App. 1 Cir. 6/9/06), 938 So.2d 181, 186, writ denied, 06-1713 (La. 1/26/07), 948 So.2d 164.

There is evidence in the instant case that the defendant sold methamphetamine (of an uncertain quantity) to the victim on the day of her death, that methamphetamine may have contributed to her death, and that the victim remained in possession of 1.62 grams of methamphetamine.[5] Significantly, no witness could testify to seeing the victim actually ingest or consume methamphetamine purchased from the defendant, and the victim was not in the company of the defendant on the previous day, nor was the victim in the company of the defendant for an extended period of time during the day of her death.[6] Since the expert forensic pathologist, Dr. Tape, indicated the methamphetamine in the victim's body could have been ingested or consumed either the day prior to, or on the morning of, her death (and presumably any time in between),[7] the prosecution failed to exclude every

---

[5] The evidence shows that on September 19, 2018 at 3:30 a.m., the victim texted the defendant "What you do for me for $130," to which the defendant responded "7." Bonin testified she saw the victim purchase Xanax and methamphetamine from defendant. The State asserts that the cell phone texts are circumstantial evidence of the amount of drug purchased. The defendant denied ever selling drugs to the victim, and there was no witness testimony presented other than that of Bonin that the defendant sold methamphetamine to the victim (and Bonin did not testify to the amount allegedly sold to the victim). Therefore the State's argument that it established the victim purchased 7.0 grams of methamphetamine from the defendant, such that it was also established (since the victim had only 1.62 grams of methamphetamine left in her possession at the time of her death) that it could be concluded that she had ingested or consumed 5.38 grams of methamphetamine sold to her by the defendant, is tenuous at best.

[6] The victim arrived at the group's hotel room, around 4:00 a.m. on September 19, 2018, The witnesses agreed that the victim left and did not return until the next morning, variously stating that she returned either at sunrise or sometime between 8:00 and 10:00 a.m. on September 19, 2018.

[7] The testimony of Dr. Tape, taken as a whole, can be summarized as follows. Dr. Tape indicated that "cause of death is a diagnosis of exclusion." He illustrated that statement by stating that, if

reasonable hypothesis of innocence on the part the defendant in this case, as required by La. R.S. 15:438 ("The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."). Because there was *no* evidence the victim ingested or consumed the methamphetamine that the defendant sold to her on the day she died, and the medical testimony established that the methamphetamine in the victim's body at the time of her death could have been consumed before her purchase of methamphetamine from the defendant, an essential element of the crime alleged was not established.[8] See **State v. Chambers**, 05-1517, pp. 6-10 (La. App. 3 Cir. 5/24/06), 933 So.2d 200, 204-06 (wherein the State's evidence was circumstantial, with regard to whether the victim ingested or injected any portion of the OxyContin the defendant distributed, and did not sufficiently exclude the possibility that the victim ingested OxyContin "from a different source"; thus, "the facts presented [did] not exclude every reasonable hypothesis of innocence beyond a reasonable doubt as required by La. R.S. 15:438" and "the state … failed to carry its burden").

In this case, the appellate court concluded that it was error for the district court to convict the defendant, absent proof of the crucial element that the victim had

_____

the victim had suffered a gun shot wound or a natural disease, the cause of death would have been obvious. He stated, "I don't have a gun shot wound or I don't have a natural disease then the cause of death is morphine [which is a metabolite of heroin] … And *I suspected it might be heroin*." (Emphasis added.) However, since the cause of the victim's death was drug-related and there was no way they could determine exactly how long the drugs had been in the victim's system, based on the fact that "if you take more of an [sic] substance it will last longer in your system," Dr. Tape stated that the drugs in the victim's system could have been taken either the day of death or the day before death. Dr. Tape could only conclude the drugs were "in her system prior to death." Because the toxicology results could only reveal the presence of the drugs in the blood stream before death, not the time the various drugs were introduced into the bloodstream, the official "medical opinion" could only be denominated as "poly drug toxicity."

[8] Not only was the victim absent for a significant period of time during the early morning hours of September 19, 2018 from the company of the defendant and Amberly Bonin, there was significant testimony that the victim had been acquiring illicit drugs from other people, not just the defendant and Bonin. Therefore, it would not have been reasonable for the jury to conclude that the victim got all her methamphetamine from the defendant and Bonin as her exclusive drug-dealers, since they clearly were not the victim's only source of drugs.

ingested or consumed the methamphetamine distributed or dispensed by the defendant, and that consumption and was the direct cause of death, as required for conviction under La. R.S. 14:30.1(A)(3). The appellate court ruled these "gaps in the evidence" (the record did not demonstrate that the defendant had distributed an amount of methamphetamine to the victim that exceeded the amount she still had in her possession when she died as "the record is void of any evidence which quantified the amount provided to her," and "more importantly, neither Bonin nor anyone else testified that the victim ingested the methamphetamine Defendant provided to her"), rendered the evidence insufficient to support the defendant's second degree murder conviction, and a "conviction based on insufficient evidence cannot stand as it violates Due Process." **State v. Bartie**, 23-0780 at pp. 17-18, 389 So.3d at 1033-34 (citing U.S. Const. amend. XIV). We agree.

The evidence presented by the State is insufficient for another reason not addressed by the Court of Appeal. The State's expert Dr. Tape answered "Yes, sir" to the following question posed by the prosecutor: "[I]n this case it is your medical opinion that the *combination* of these substances found in the patient's body in particular the methamphetamine and the fentanyl were the ultimately [sic] cause of death?" (Emphasis added.)

The statute requires proof of the "direct cause" of death. This is as close as the State came. There was no proof whatsoever that defendant provided the victim with fentanyl, and the question was never asked whether consumption of methamphetamine alone was the direct cause of death of this victim. We therefore find evidence presented in this case was insufficient under the **Jackson v. Virginia** standard.

It is curious that the heroin dealers from Welsh who apparently communicated by phone with the group were not involved in this prosecution given the phone tracking technology available to law enforcement, and it is likewise curious that the

9

person who procured the heroin, the person who participated in administering the heroin, and the person who drove the victim from one hotel to the next instead of the hospital were likewise not involved.

In brief to this court, the State additionally asserts that the appellate court erroneously determined that the responsive verdict of negligent homicide was inapplicable. The State did not raise any issues related to this finding in its writ application to this court. The only assignments of error raised in the State's application concerned the court of appeal's analysis and application of the **Jackson** standard to the second degree murder conviction. Now, the State argues for the first time in its brief that the court of appeal erred in not entering a guilty verdict for the responsive verdict of negligent homicide. However, "additional questions briefed for oral argument, but not contained in the original writ application, are not properly before us." **Boudreaux v. State, Department of Transportation & Development**, 01-1329, p. 5 (La. 2/26/02), 815 So. 2d 7, 11 (per curiam).

## DECREE

Accordingly, for the reasons stated, we affirm the appellate court decision.

**AFFIRMED.**

# SUPREME COURT OF LOUISIANA

## No. 2024-K-00897

## STATE OF LOUISIANA

## VS.

## DEON RAY BARTIE

*On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Allen*

**WEIMER, C.J.**, dissenting.

Defendant was convicted of second degree murder pursuant to La. R.S. 14:30.1(A)(3). The task before this court is to determine whether the State sufficiently proved all necessary elements of that crime, applying the standard of review set forth in **Jackson v. Virginia**, 443 U.S. 307 (1979). Under **Jackson**, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." **Id.**, 443 U.S. at 319.

In this case, a conviction under La. R.S. 14:30.1(A)(3) rests on proof beyond a reasonable doubt of three elements: (1) the defendant unlawfully distributed or dispensed a Schedule I through V controlled dangerous substance, or combination of substances, to the victim; (2) the victim ingested or consumed the controlled dangerous substance; and (3) the ingestion or consumption of the controlled dangerous substance was the direct cause of the victim's death.

As to the State's proof of the first element, there is really no dispute. As the majority notes, "[t]here is evidence in the instant case that the defendant sold methamphetamine ... to the victim on the day of her death." **State v. Bartie**, 24-00897 (La. 2/__/25), slip op. at 7. Where the dispute in this case lies, and where I

depart from the majority's analysis, is with the sufficiency of the evidence establishing the second and third elements of the crime.

Ultimately, the majority finds that the second element of the crime–that the victim ingested or consumed the controlled dangerous substance–was not proved, "[b]ecause there was *no* evidence the victim ingested or consumed the methamphetamine that the defendant sold to her on the day she died, and the medical testimony established that the methamphetamine in the victim's body at the time of her death could have been consumed before her purchase of methamphetamine from the defendant." *Id.*, slip op. at 8. While it is certainly true that no one testified to having observed the victim ingest the methamphetamine the defendant supplied, the law does not require the State to produce an eyewitness to the actual ingestion of the controlled dangerous substance. That element of the offense can be established by circumstantial evidence, and in this case the circumstantial evidence demonstrates that it was eminently reasonable for the jury to conclude the methamphetamine supplied by the defendant was in fact ingested by the victim on the day of her death.

Amberly Bonin testified that she witnessed defendant sell methamphetamine and Xanax to the victim around 9 or 10 am on the day she died. She further testified that she observed the victim ingest one of those substances, which she identified as Xanax. However, no Xanax was found in the victim's system. Given this fact, it was reasonable for the jury to infer that it was the methamphetamine and not the Xanax the victim actually ingested, an inference made all the more reasonable by the fact that a baggie of methamphetamine was found among the victim's belongings that was packaged similarly to methamphetamine found among defendant's belongings, and the quantity of methamphetamine found with the victim's belongings was approximately 5 grams less than the 7 grams the victim had arranged to purchase

2

from defendant only a few hours earlier. Applying **Jackson**'s objective standard of review in light of the foregoing evidence, it was clearly reasonable for the jury to conclude that the State proved beyond a reasonable doubt that the victim ingested the methamphetamine supplied by the defendant.

This conclusion is not undermined by the majority's conjecture that because the victim left the hotel room for approximately 4-6 hours *before* she purchased methamphetamine from defendant, she could have also obtained methamphetamine from another source, and thus every reasonable hypothesis of innocence was not excluded in this circumstantial evidence case. The majority's conjecture in this regard is just that. The requirement that jurors reasonably reject the hypothesis of innocence advanced by the defendant in a circumstantial evidence case presupposes that a rational rejection of that hypothesis is based on the evidence presented, not mere conjecture or speculation. See **State v. Schwander**, 345 So.2d 1173, 1175 (La. 1977). Evaluating the evidence in the light most favorable to the prosecution, as **Jackson** requires, the hypothesis of innocence advanced and accepted in the majority opinion is simply not sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the facts of this case. See **State v. Captville**, 448 So.2d 676, 680 (La. 1984). I respectfully disagree, therefore, with the majority's finding that the second element of the offense was not proved beyond a reasonable doubt.

Because the majority determines one element of the offense was not proven, the majority can end its analysis. Nevertheless, although not necessary to its decision, the majority goes on to address the sufficiency of the evidence regarding the third element of the offense; *i.e.*, that the controlled dangerous substance supplied by the defendant (the methamphetamine) and ingested by the victim was the direct cause of

3

her death. Drawing on the testimony of Dr. Tape, the expert forensic pathologist called by the State, the majority finds no proof was offered of the "direct cause" of the victim's death. The majority rests this conclusion on Dr. Tape's testimony that it was the combination of methamphetamine and fentanyl that ultimately caused the victim's death, and the fact that "the question was never asked whether consumption of methamphetamine alone was the direct cause of death of this victim." **Bartie**, 24-00897, slip op. at 9.

While it is true that Dr. Tape was not asked the precise question recited by the majority, he did testify that the methamphetamine levels in the victim's system were lethal and that the methamphetamine could have, on its own, resulted in an overdose death. Although the majority places emphasis on the doctor's identification of the cause of death as a combination of drugs, La. R.S. 14:30.1(A)(3) does not require that the particular drugs dispensed by the defendant be the *sole* cause of death. **State v. Hano**, 05-2090, p. 18 (La.App. 1 Cir. 6/9/06), 938 So.2d 181, 192-93. In this case, although Dr. Tape testified that it was the combination of all the drugs found in the victim's system that resulted in her death, he additionally testified that *all* of those drugs were present at lethal levels. Thus, this is not a case in which the victim died as a result of ingesting a combination of drugs when none of the drugs by themselves would have necessarily been fatal. Dr. Tape's testimony was unambiguous: the methamphetamine, all on its own, was at a lethal level in the victim's body. Viewing this testimony in the light most favorable to the State, as **Jackson** directs, it was therefore reasonable for the jury to find this element of the crime was proved beyond a reasonable doubt.

This is a difficult and tragic case. Drug-induced homicide statutes similar to La. R.S. 14:30.1(A)(3) are currently a burgeoning topic across the country and much

4

has been written about the efficacy of such statutes in actually deterring drug-related deaths, the due process concerns associated with proving causation, and the potential social and moral pitfalls of holding addicts responsible for the deaths of other addicts. See, e.g., Taleed El-Sabawi, Jennifer J. Carroll, and Morgan Godvin, *Drug-Induced Homicide Laws and False Beliefs about Drug Distributors: Three Myths that are Leaving Prosecutors Misinformed*, 60 Am.Crim.L.Rev. 1381, 1385 (2023); Kaitlin S. Phillips, *From Overdose to Crime Scene: The Incompatibility of Drug-Induced Homicide Statutes with Due Process*, 70 Duke L.J. 659 (2020); Rachel L. Rothberg, Kate Stith, *The Opioid Crisis and Federal Criminal Prosecution*, 46 J.L.Med. & Ethics 292 (2018). However, such issues are policy considerations best addressed by the legislature.Whether or not one agrees with that policy decision made by the legislature is not the issue in this case. The role of the judiciary is to apply the law as written by the legislature. It is not the role of the judiciary to make policy, but to apply the policy contained within the statutes written by the legislature. Here, the evidence clearly supports the jury's determination that all essential elements of the offense of second degree murder pursuant to La. R.S. 14:30.1(A)(3) were proved beyond a reasonable doubt. Therefore, I respectfully dissent. I would reverse the decision of the court of appeal and reinstate the jury's verdict.

# SUPREME COURT OF LOUISIANA

# No. 2024-K-00897

# STATE OF LOUISIANA

# VS.

# DEON RAY BARTIE

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Allen

**Hughes, J., additionally concurring.**

Because I believe the State's highest court should be precise in its writings, I make the following observations.

Dr. Tape did not testify that "methamphetamine", on its own, was at a lethal level in the victim's body. Instead, he twice testified that amphetamine, a different substance, was at a level high enough to be lethal. Record 1783 and 1784.

With respect to "methamphetamine", he testified the level was enough that it "could" have resulted in an "overdose". The word "death" was not used. Record 1785.

"Could" is used to indicate possibility, as in "they could be right". This is not enough to satisfy the civil burden of "more probable than not". The standard of proof in a criminal prosecution is "beyond a reasonable doubt".

SUPREME COURT OF LOUISIANA

No. 2024-K-00897

STATE OF LOUISIANA

VS.

DEON RAY BARTIE

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Allen

**CRAIN, J.**, dissenting.

There is no dispute the victim purchased methamphetamine from defendant on the day she died. The evidence established the victim arranged to purchase seven grams of methamphetamine from defendant and, after her death, less than two grams were found among her possessions, in packaging similar to the methamphetamine found with defendant's belongings. Bonin testified she saw the victim ingest something defendant sold her. Although Bonin described the substance as Xanax, the toxicology report did not reveal Xanax in the victim's system. Shortly after purchasing the methamphetamine, the victim lost consciousness, then died.

The state is not required to produce an eyewitness to testify they saw the victim ingest the particular drug. Based on the evidence presented, it was reasonable for the jury to infer the victim consumed the methamphetamine she purchased from defendant, and that Bonin mistakenly identified it as Xanax. The possibility the methamphetamine came from another unknown source is not reasonable. To reach that conclusion requires reweighing the evidence and substituting our opinion for the jury's. That is not our role.

The court of appeal reversed the conviction, finding the ingestion element was not proven. Thus, its inquiry ended. The majority addresses the third element of the offense—that the victim died as a direct cause of ingesting or consuming the methamphetamine. To this end, the state's expert was asked if the victim died of a combination of drugs and answered affirmatively. Nevertheless, the majority finds

1

insufficient evidence to prove the third element because there was no proof defendant supplied the *other* lethal drugs. The state's expert was not asked whether consumption of methamphetamine *alone* directly caused the victim's death.

Louisiana Revised Statutes 14:30.1(A)(3) does not require proof the drug dispensed by the defendant was the *only* cause of death. *See State v. Hano*, 05-2090 (La. App. 1 Cir. 6/9/06), 938 So.2d 181, 192-93, *writ denied*, 06-1713 (La. 1/26/07), 948 So.2d 164; *State v. Jones*, 598 So.2d 511, 514 (La. App. 1 Cir. 1992). The expert testified the victim died with lethal levels of methamphetamine and other drugs in her system. This establishes *each one of those substances* could have been fatal to the victim. The evidence supports that this defendant sold a lethal amount of methamphetamine to this victim, who ingested it. The existence of a lethal level of other drugs in her system is immaterial. The fact that a lethal level of methamphetamine may have combined with other drugs does not eliminate its effect in causing the victim's death. The victim did not die as a result of combining non-lethal levels of multiple drugs.

When viewed in the light most favorable to the prosecution under the due process standard of *Jackson v. Virginia*, the direct and circumstantial evidence was sufficient to convict defendant of second degree murder and eliminate every reasonable hypothesis of innocence. The state proved the defendant distributed methamphetamine to the victim, the victim ingested it, and the victim died with a lethal level of methamphetamine in her system. I would find the evidence was sufficient to establish the methamphetamine was a direct cause of the victim's death. I would reverse and reinstate the jury's verdict.

In addition to disagreeing with the majority's analysis and conclusion, I specifically take no part in its commentary on the state's prosecutorial choice not to present testimony relative to the victim's heroin use. That choice is not ours to make and has nothing to do with the case before us.

2

# SUPREME COURT OF LOUISIANA

## No. 2024-K-00897

## STATE OF LOUISIANA

## VS.

## DEON RAY BARTIE

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Allen

**McCALLUM, J., dissents and assigns reasons.**

If three people each simultaneously fire a shot into a crowd, all are guilty when someone is struck. It is inconsequential which of the bullets actually killed the victim as any one of the three could have. This reasoning applies equally to this matter. On this basis, and the reasons set forth by Justice Crain in his dissent, I respectfully dissent.